**SOUTHWEST PET PRODUCTS, INC., an Arizona Corporation, Earth Elements, Inc., f/d/b/a Nature's Recipe Pet Foods, Real Party in Interest, Plaintiffs,**

v.

**KOCH INDUSTRIES, INC., Koch Agriculture, Inc., Koch Agri–Services, Benson–Quinn Co., and Harvest States Cooperatives, Defendants.**

No. Civ.A. 95–2531PHXRGS.

United States District Court,
D. Arizona.

March 9, 2000.

MEMORANDUM AND ORDER

YOUNG, District Judge.[1]

### I. *Introduction*

The plaintiffs in this action, Southwest Pet Products, Inc. ("Southwest") and Earth Elements, Inc. ("Earth Elements"), allege that the various defendants sold them wheat infected with a toxin that was incorporated into pet food and eventually made several dogs ill. Southwest manufactured the pet food and sold it to Earth Elements, who packaged it for end users. Those two companies have settled with each other and now bring claims against the remaining members of the chain of distribution. All of the defendants have brought motions to dismiss, each on largely similar grounds. Though every dog may indeed have its day, for the reasons described herein, today is only very dimly the plaintiffs'.

---

1. Of the District of Massachusetts, sitting by designation.

II. *Factual and Procedural Background*

The following facts are based primarily on allegations in the Third Amended Complaint (the "Complaint"):

On or about April 7, 1995, Southwest, a manufacturer of dog food, contracted with Koch Agriculture, Inc. (together with related Koch companies, "Koch"), for the purchase of approximately 1400 tons of feed wheat. *See* Third Am.Compl. ¶ 19 (hereinafter "Compl."). The purchase agreement was confirmed in a written "sales confirmation" dated April 20, 1995. *See id.* ¶ 24. Koch purchased the wheat that it sold to Southwest from Benson–Quinn Co. ("Benson") and Harvest States Cooperatives ("Harvest"). In May of 1995, Southwest had samples of delivered wheat tested for vomitoxin by Wasatch Laboratories, Ltd. ("Wasatch"). *See id.* ¶ 64. The results showed "less than 1 ppb" of vomitoxin. *See* First Am.Compl. ¶ 23. Based upon this testing, Southwest included the wheat in dog food it manufactured for Earth Elements. *See* Compl. ¶ 65. Several customers reported that their pets either refused to eat the food or became sick after eating it. *See id.* ¶ 66.

Earth Elements recalled all of the dry dog food manufactured by Southwest between May 17, 1995 and July 20, 1995. *See id.* ¶ 69. Southwest cooperated with Earth Element's recall efforts by "devoting management time; by forbearing temporarily on collection of some amounts owed by Earth Elements; by continuing to supply Earth Elements with finished product; by reimbursing Earth Elements for some of its recall expenses; and by incurring other expenses related to the recall." *Id.* ¶ 74. Southwest alleges that tests of finished product samples, and retained samples of delivered wheat, indicated higher than acceptable levels of vomitoxin, *see id.* ¶ 68, and that the wheat did not conform to the sales contract between Southwest and Koch, *see* Compl. ¶¶ 11, 19, 24. Southwest further alleges that it contracted with Koch for "feed wheat," but that Benson and Harvest supplied Koch with "sample grade" wheat, while representing in their bills of lading and other "delivery documents" that the wheat and the rail cars contained "feed wheat." *See id.* ¶¶ 20, 24, 54, 88. In addition, Southwest and Earth Elements allege that "sample grade" wheat is unsuitable as an ingredient in pet food. *See id.* ¶ 61. Finally, Southwest alleges that Wasatch failed to exercise reasonable care or competence in its testing of the wheat. *See id.* ¶ 85.

On October 12, 1995, Earth Elements filed a complaint in the United States District Court for the Southern District of California (the "California Litigation"), naming Harvest, Benson, Koch, and Southwest as defendants. The complaint alleged negligence, negligence per se, negligent interference with prospective economic advantage, strict products liability, breach of implied warranties, and equitable indemnity. Not to be outdone, Southwest then marked its territory by filing a complaint in the United States District Court for the District of Arizona (the "Arizona Litigation"), naming Earth Elements, Koch, Benson, Harvest, and Wasatch as defendants.

In 1996, Southwest, Koch, Harvest, and Benson each filed separate motions in the California Litigation to dismiss all the claims asserted in Earth Element's complaint, with all parties arguing that liability from their business transactions should be limited to breach of contract claims only, pursuant to the economic loss rule.

On March 22, 1996, Earth Elements filed a motion to stay the Arizona Litigation, which was granted in the dog days of an Arizona summer, on August 19, 1996. In the California Litigation, on September 6, 1996 and December 26, 1996, Judge Timlin dismissed all of Earth Element's claims against Southwest, Koch, Harvest, and Benson, holding that the economic loss rule precluded recovery under any of Earth Element's four tort claims, that Earth Element's contractual claims against Harvest and Benson failed because of a lack of privity, and that the indemnity

claim failed because Earth Elements had not pleaded that it suffered any loss.

Also on December 26, 1996, Southwest circulated a stipulation to transfer the Arizona Litigation to California. On May 30, 1997, Southwest filed a formal withdrawal of its opposition to Earth Elements' motion to transfer the Arizona Litigation to California. In November 1997, the Arizona Litigation was transferred to California.

Thereafter, on December 15, 1997, Earth Elements and Southwest entered into a settlement agreement. *See* Compl. ¶¶ 72–73. Southwest alleges that it paid Earth Elements total consideration of not less than $21,000,000 under the settlement agreement, including $1,000,000 in cash and the assignment of certain of Southwest's claims against the defendants in this lawsuit. *See id.* ¶ 73.

On February 3, 1999, the California court retransferred the Arizona Litigation to the District of Arizona. The instant motions were pending at the time of transfer.

### III. *Discussion*

#### A. *Motion to Dismiss Standard*

A claim may be dismissed only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *United States v. Claiborne*, 781 F.2d 1334, 1337 (9th Cir.1986) (quoting *Sherman v. Yakahi*, 549 F.2d 1287, 1290 [9th Cir.1977]).

#### B. *Koch's Motion to Dismiss*

Southwest brings a variety of claims against Koch: breach of contract (Count I), breach of express warranty (Count V), breach of the implied warranty of merchantability (Count XIII), and breach of the implied warranty of fitness (Count XIV) (collectively, the "Contract Claims"); intentional misrepresentation (Count II), negligent misrepresentation (Count III),

concealment (Count IV), negligence (Count VI), strict products liability (Count X), negligent interference with a prospective economic advantage (Count XI), and intentional interference with a prospective economic advantage (Count XII) (collectively, the "Tort Claims"); and, finally, equitable indemnity (Count VIII) and implied contractual indemnity (Count IX) (together, the "Indemnity Claims"). With dogged persistence, Koch has moved to dismiss each of these claims.

#### 1. *The Contract Claims*

Koch argues that each of the Contract Claims must fail because the written contract between Koch and Southwest expressly disclaims all implied warranties, limits recovery to replacement of the wheat or a refund of the difference between the contractual price and the fair market value, and excludes recovery of incidental and consequential damages. Specifically, Koch relies upon the written sales confirmation that was signed by both parties on April 20, 1995 (the "Confirmation"). *See* Koch Mem.Ex. B.[2] On the reverse side of the Confirmation, several pertinent provisions were included:

1. **CONFIRMATION:** This document contains a contract between Buyer and Seller. Unless objected to in writing within five days, the terms hereof shall be the contract.

6. **WARRANTIES:** Koch Agri Services has made no warranty to the Buyer except as appearing expressly within the written terms of this contract. The goods are sold AS IS. **IMPLIED WARRANTIES OF MERCHANTABILITY AND IMPLIED WARRANTIES OF FITNESS ARE EXPRESSLY EXCLUDED.**

7. **DAMAGE LIMITATION:** IN NO EVENT SHALL KOCH AGRI SERVICES BE LIABLE FOR INCIDEN-

---

**2.** In *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), the Ninth Circuit made clear that a district court can consider the terms of a contract which is the subject of a dispute even if it has not been attached to the complaint. Such consideration does not convert the motion to dismiss into a motion for summary judgment. *See id.*

TAL OR CONSEQUENTIAL DAMAGES. If the goods fail to meet the contract description in any particular, the Buyer shall give immediate notice to Koch Agri Services and submit samples for Federal Inspection. If the inspection establishes the goods failed to conform to the contract description, Koch Agri Services may at it's election either replace the goods with the conforming goods within a reasonable time, or pay to the Buyer the difference between the contract price and fair market value of the goods delivered. **THE REMEDIES PROVIDED IN THIS PARAGRAPH ARE EXCLUSIVE.**

9. **AGREEMENT:** This contract together within any written account agreement is the parties entire agreement, incorporating all of the parties prior negotiations. Any amendment or modification must be by a signed writing.

*Id.* Because Southwest has only alleged incidental and consequential losses in the Complaint, Koch argues that the Confirmation on its face precludes contractual recovery.

In response, Southwest raises an argument with an authoritative bark but no actual legal bite. Southwest claims that in the Complaint it defined the parties contractual agreement only to include the verbal agreement and the *front* side of the Confirmation. It specifically avoided including the *reverse* side of the Confirmation in the Complaint. Thus, Southwest argues that "[b]ecause the Court must accept all well-pleaded allegations as true, the contract as defined by [Southwest] must be the contract adopted by the Court for purposes of the motion to dismiss." Southwest Opp'n Mem. at 6. Moreover, "[b]ecause [Koch] contends that the 'contract' includes different terms than the [contract as defined by Southwest], the resolution of the contract definition issue requires a factual inquiry and precludes dismissal of any contract claim." *Id.*

█ Though one might be tempted to give Southwest a bone based on the sheer novelty of this syllogistic argument, it is ultimately one for the dogs. It is true that, in reviewing a motion to dismiss, the Court must accept only well-pleaded factual allegations as true. *See Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). "The Court need not, however, accept legal conclusions pled in the complaint even if they are asserted as 'facts.' " *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1228 (N.D.Cal.1994). This is particularly true when " 'the legal effect of the events plaintiff has set out in these allegations do not reasonably flow from his description of what happened, or if these allegations are contradicted by the description itself.' " *In re Fortune Sys. Sec. Litig.,* 604 F.Supp. 150, 159 (N.D.Cal.1984) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 at 597). In other words, parties cannot create factual disputes by poaching certain provisions out of a contract and purposefully omitting the rest. As Koch argues in its reply memorandum, "[Southwest] seeks to make a mockery of the law of contracts by coming into court, suing under a written instrument, and then disavowing terms of the written contract that are unfavorable to it." Koch Reply Mem. at 3. Rather than allow Southwest selectively to disavow an agreement that it admits to signing and whose authenticity it does not dispute, the Court rules that the parties' contractual relationship is governed by *both* sides of the Confirmation.

In recognition that it would be hounding the Court to press this waggish argument, Southwest turns to a variety of legal doctrines that allow courts to refuse to enforce contractual provisions under certain circumstances: (1) the reasonable expectation of the parties test, (2) unconscionability, and (3) failure of an essential purpose.

Within the dog-eared pages of the Pacific Reporter, the Arizona Supreme Court has held that "[w]here the other party has reason to believe that the party manifesting assent would not do so if he knew the writing contained a particular term, the term is not part of the agreement." *Dar-*

*ner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 391, 682 P.2d 388 (1984). In so ruling, the Arizona Supreme Court expressly adopted Section 211 of the Restatement (Second) of Contracts. *See id.* Comment F of Section 211 explains the circumstances under which a court may determine that the other party has reason to believe that the manifesting party would not accept a particular term:

> Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view.

*Id.* at 392, 682 P.2d 388 (quoting Restatement [Second] of Contracts § 211 cmt. f [1979]).

Southwest's Complaint makes no allegations which suggest that Koch had reason to believe that Southwest would not have accepted the Confirmation had it known of the terms on the reverse side. Instead, Southwest simply asserts that "[g]iven the prior dealings of the parties, which did not include the [warranty and remedy limitations], Koch could not have reasonably expected Southwest to agree to such new terms." Southwest Opp'n Mem. at 9. Southwest also begs for permission to develop a factual record regarding the parties' prior dealings in order to determine whether Koch had reason to believe that Southwest would not accept the warranty and remedy exclusions. *See id.* The Court rejects this request. Southwest's Complaint merely contains allegations regarding its own professional negligence. *See* Compl. ¶¶ 28 (Southwest "never discussed the terms and conditions"); 31, 40–41 (Southwest "did not negotiate" the terms and conditions); 32 (Southwest "was not aware" of the terms and conditions); 33 (Southwest "did not knowingly accept" the terms and conditions). The alleged prior dealings of Southwest's agent and Koch are not mentioned in the Complaint, but appear only in Southwest's opposition memorandum. As such, the only properly pleaded facts in the Complaint concern Southwest's ignorance of the contract terms and conditions.

■ Under Arizona law, this ignorance is insufficient to invoke the rule. The reasonable expectations rule "charges the customer with knowledge that the contract being 'purchased' is or contains a form applied to a vast number of transactions and includes terms which are unknown (or even unknowable); it binds the customer to such terms." *Darner,* 140 Ariz. at 393–94, 682 P.2d 388; *see also id.* at 400, 682 P.2d 388 (Cameron, J., concurring) ("[T]he majority opinion recognizes that in most [transactions] ... involving standardized forms, the 'boilerplate' will probably neither be read nor understood. Those terms, however, are still enforceable unless the seller should know that they would not be acceptable."). Put differently, the Arizona courts recognize that a purchaser "may waive [its] commercial remedies even though [it] is uninformed as to what [it] is waiving, is unaware of the waiver, and would not have entered into the transaction had [it] known about it." *Salt River Project Agric. Improvement and Power Dist. v. Westinghouse Elec. Corp.,* 143 Ariz. 368, 385, 694 P.2d 198 (1984) (hereinafter *"Salt River Project II "*). It is only the *seller's* awareness that bears on the question of whether a term violates the reasonable expectations of the parties. *See Security Ins. Co. v. Andersen,* 158 Ariz. 431, 438, 763 P.2d 251 (Ariz.Ct.App. 1986), *vacated in part,* 158 Ariz. 426, 763 P.2d 246 (1988). Because Southwest has not alleged any facts relevant to that question, it is quite simply barking up the wrong tree.

Southwest also contends that the Confirmation should not be enforced because it contained unconscionable terms. In Arizona, "[u]nconscionability is a question of

law for the court to decide." *Angus Med. Co. v. Digital Equip. Corp.,* 173 Ariz. 159, 167 n. 3, 840 P.2d 1024 (Ariz.Ct.App.1992). The Arizona Supreme Court has emphasized that "findings of unconscionability in a commercial setting are rare." *Salt River Project II,* 143 Ariz. at 375, 694 P.2d 198. Given the rather standard nature of the warranty and remedy limitations at issue in this case, and given the highly sophisticated nature of Southwest and Earth Elements, it is extremely doubtful that Southwest will be able to show that the Confirmation is unconscionable as matter of law. The challenged clauses in the instant litigation are near-universal terms applied in the dog-eat-dog world of commerce.

■ Nevertheless, the Arizona Supreme Court has interpreted its version of the Uniform Commercial Code to require that the court allow parties to present evidence whenever a claim of unconscionability is made. Section 47–2302(B) of the Arizona Revised Statutes states, "When it is claimed ... that the contract or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." In *Maxwell v. Fidelity Fin. Servs., Inc.,* 184 Ariz. 82, 87, 907 P.2d 51 (1995), the Arizona Supreme Court interpreted this provision to require that "when it is claimed that the contract is unconscionable, the parties must be given an opportunity to present evidence of its commercial setting, purpose, and effect to aid the court in making the determination."[3] Southwest seems to believe that this will require an evidentiary *hearing. See* Southwest Opp'n Mem. at 10. The statute, however, only requires a "reasonable opportunity" to present evidence, which presumably could include documentary presentation on a summary

judgment motion. Thus, the Court DENIES Koch's motion to dismiss with respect to the issue of unconscionability, without prejudice to a summary judgment motion once discovery on that limited issue has been completed. Of course, given the extremely difficult burden Southwest would appear to have in demonstrating unconscionability, the company may be well-advised simply to let sleeping dogs lie.

■ Finally, Southwest argues that the limitation of remedies provision in the Confirmation fails its essential purpose because the vomitoxin in the wheat was a latent defect. Some courts have held that when a defect in goods is latent and not discoverable upon receipt of shipment and reasonable inspection, then a remedies limitation provision will fail its essential purpose. *See, e.g., Neville Chem. Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1215 (3rd Cir.1970) (defect in resin oil not discoverable until after the goods had been processed). Southwest has not alleged, however, that the defect in the wheat was not discoverable prior to processing. Instead, it has alleged that it "was not *discovered* upon receipt ... and was not in fact discovered until after it was combined with other ingredients and used to make pet food." Compl. ¶ 48 (emphasis added). The fact that Southwest sent the wheat to Wasatch for testing prior to processing, *id.* ¶ 64, and the fact that Southwest brought suit against Wasatch for "fail[ing] to exercise reasonable care or competence" in its testing, First Am.Compl. ¶ 85, suggest that the alleged defect was in fact discoverable. As an experienced processor of wheat into pet products, Southwest knew that there was a possibility that purchased wheat would be infected. Presumably that knowledge is what prompted Southwest to send the wheat to Wasatch for testing. The fact that the Confirmation contained a

---

**3.** This interpretation would seem effectively to bar allowance of a Rule 12(b)(6) motion any time a party makes an allegation of unconscionability. For that reason, other jurisdictions have held that the evidentiary record need only be developed after the court makes a threshold determination that the pleadings contain sufficient allegations of unconscionability. *See Fleischmann Distilling Corp. v. Distillers Co. Ltd.,* 395 F.Supp. 221, 234 n. 18 (S.D.N.Y.1975). In this case, however, the Court must follow Arizona law.

provision limiting Southwest's remedy to replacement or refund merely represents an allocation of the risk of a latent defect.[4] *See Stepan Co. v. Winter Panel Corp.*, No. 95 C0762, 1996 WL 392134, at *15 (N.D.Ill. July 10, 1996) ("The fact that the parties included a remedy provision of this type in this contract evidences knowledge by each party that defects could occur with the chemicals. Thus, the parties must have known the risk of defects and allocated the risk."); *Jim Dan, Inc. v. O.M. Scott & Sons Co.*, 785 F.Supp. 1196, 1200 (W.D.Pa. 1992) ("Scott's limitation clause does not fail of its essential purpose because ... the clause does exactly what it was designed to do: limit the buyer's remedy to the purchase price of the product. Like the film industry, herbicides involve latent risks.").

Southwest also contends that the remedies limitation provision fails its essential purpose because it lacked sufficient alternative remedies. Southwest's own cases, however, recognize that "mere failure to replace or repair would not cause the court to read in the general remedy provision of the UCC." *Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955 (9th Cir.1977). Southwest attempts to argue that the remedies limitation provision in the Confirmation did not contain a "replace or refund" alternative remedy. Not so. The provision states quite clearly: "If ... the goods fail to conform to the contract description, Koch Agri–Services may at it's [sic] election either replace the goods with the conforming goods within a reasonable time, or pay to the buyer the difference between the contract price and the fair market value of the goods deliv-

ered." Koch Mem.Ex. B. Because the express terms of the Confirmation allow Southwest to pursue a refund remedy, the Confirmation does not fail its essential purpose: "[T]he availability of a refund remedy will prevent a repair remedy from failing its essential purpose." *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 29 (Tenn.Ct.App.1993). The Confirmation provided that "[i]f the goods fail to meet the contract in any particular, the Buyer shall give immediate notice to Koch Agri Services and submit samples for Federal Inspection." Koch Mem.Ex. B. From the Complaint, it appears that Southwest made demands upon Koch only *after* the wheat was already processed into pet food and causing disturbances to customers and their canines. Thus, Southwest's restriction of available remedies under the contract is due only to its own failure to act.

In summary, the Court DENIES the motion to dismiss the Contract Claims. Under Arizona law, Southwest may attempt to demonstrate that the reverse side of the Confirmation contained unconscionable terms in light of the commercial setting and other factual circumstances surrounding the making of the Confirmation. If such a demonstration succeeds, Southwest's reliance upon implied warranties will reach the jury. If not, Southwest will be limited to its express contract claims as stated in Counts I and V.[5]

### 2. *The Tort Claims*

■ As a general matter, "[w]hen a defect renders a product substandard ...,

4. Southwest disputes that it knowingly allocated the risk of latent defect by pointing out that in the Complaint it expressly disclaims that any negotiation occurred. *See* Compl. ¶¶ 40–41. Southwest fails to understand the legal significance of its actions. The Confirmation tendered to Southwest contained a provision pursuant to which Southwest could object to any provisions within five days. By failing to so object and by signing the Confirmation, Southwest manifested its assent to the Confirmation, including its allocation of the risk of latent defect.

5. Koch somehow believes that if Southwest fails to demonstrate unconscionability, *all* of the Contract claims must be dismissed. Although not articulated, Koch's theory must be that because Southwest failed to demand that Koch cure the defective goods prior to the incorporation of the wheat into the dog food, Southwest has waived all remedies under the contract. Koch's unsupported conclusions to the contrary, the question whether a finding of waiver inevitably follows from the contract and controlling Arizona law is not presently before the Court.

the purchaser's remedy for disappointed commercial expectations is through contract law." *Salt River Project II,* 143 Ariz. at 376, 694 P.2d 198. This "economic loss rule" serves to prevent parties from undermining the certainty of contractual relationships by attempting to convert contract actions into tort actions whenever their contractual language bars a claim. To determine whether contract or tort law will define the remedies available in a specific case, the Arizona courts apply a three-part standard focusing on the nature of the product defect that caused the loss to the plaintiff, the manner in which the loss occurred, and the type of loss for which the plaintiff seeks redress. *See id.*

First, where the allegedly defective product "presents no unreasonable danger to person or property, the UCC remedy is ordinarily exclusive." *Id.* at 377, 694 P.2d 198. Southwest argues that, in this case, "[t]he nature of the product defect,—contamination with a hazardous toxin—is the sort of dangerous condition which invokes the safety incentives of tort liability, rather than limiting the remedy to those offered by the UCC." Southwest Opp'n Mem. at 19. This argument might be availing if this were a tort suit brought by the consumers (or their owners) of the latently defective product. Because Southwest is merely a manufacturer whose own person or property was not subjected to a risk of harm, contractual remedies are sufficient. *See id.*

■ Second, as the Arizona Supreme Court noted, "[t]he occurrence of a sudden calamity or an extraordinary event—an 'accident'—ordinarily marks the invocation of tort law, while the commercial code comes into play more readily when a loss is the direct result of the product's early deterioration or other failure to perform in conformity with the commercial agreement." *Id.* at 378, 694 P.2d 198. Southwest's central complaint is that the wheat it purchased failed to meet the standards required by the Confirmation. As such, the economic loss rule seems appropriate. Again, Southwest attempts to circumvent

the clear language of *Salt River Project II* by characterizing this case as one involving a toxic tort. Admittedly, the Arizona Supreme Court has indicated that "[a] product may pose an unreasonable danger to its user, even though no sudden accident has occurred, where, for example, it emits a toxic substance or its harmful effects manifest themselves only after a period of many years." *Id.* at 377–78, 694 P.2d 198. This exception does not apply in the instant case. Rather than a "classic" toxic tort like asbestos which poses a risk of danger to end users of a dangerous product, this case involves a complaint about losses that Southwest incurred because the wheat it received was allegedly not the quality of wheat for which it bargained. *See* Compl. ¶¶ 56, 60, 61. Southwest brings this case only on behalf of itself and Earth Elements. It does not represent the interests of the many pooches and puppies who allegedly became ill from ingesting the pet food (and whose owners arguably, therefore, have a claim sounding in tort). Nothing about the nature of Southwest's losses—which were incurred simply through recalling a manufactured product—suggests the "accidental," "calamitous," or even "toxic" nature of suits appropriate for tort law.

■ Finally, "[w]here economic loss, in the form of repair costs, diminished value, or lost profits, is the plaintiff's only loss, the policies of the law generally will be best served by leaving the parties to their commercial remedies." *Salt River Project II,* 143 Ariz. at 379, 694 P.2d 198. Southwest argues that this factor should not weigh against it because the Complaint alleges that other property of Southwest, apart from the wheat itself, was damaged as a result of the contamination of the product sold by Koch. Specifically, Southwest alleges that the other ingredients it used to make pet food were contaminated and therefore damaged. *See* Compl. ¶¶ 23, 74. Such an argument fails. An appellate court in Arizona has already addressed and rejected the argument that combining

one defective ingredient with other ingredients, so as to render the combined product useless, constitutes harm to "other property." In *Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc.,* 136 Ariz. 444, 449, 666 P.2d 544 (Ariz.Ct.App.1983) (quoting *Northern Power & Eng'g Corp. v. Caterpillar Tractor Co.,* 623 P.2d 324, 330 [Alaska 1981]), the court held that damage to a tractor engine could not be separated from damage to the engine's turbo-charger component for purposes of determining whether "other property" had been harmed: "Since all but the very simplest of machines have component parts, such a broad holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability."[6]

One arguable distinction in the present case is that the component parts allegedly damaged by the wheat were not sold to Southwest by the same seller, unlike the other component parts in *Arrow Leasing. See* Southwest Opp'n Mem. at 21 ("Southwest sustained direct damage to its property, not only the wheat, but a myriad of other ingredients, title to which Southwest obtained separate from its purchase of the wheat."). While that factual element may weigh against application of the economic loss rule,[7] relying on it alone to avoid invocation of the doctrine is asking the tail

to wag the dog. As the Arizona Supreme Court stated in *Salt River Project II,* "It is in the realm of this direct property damage that we believe the unreasonably dangerous nature of the product defect and the occurrence of the loss in a sudden, accidental manner would tip the balance in favor of strict tort liability...." *Salt River Project II,* 143 Ariz. at 379, 694 P.2d 198. Although Southwest has arguably demonstrated "direct property damage," it has not demonstrated any of the other conditions such as "the unreasonably dangerous nature of the product defect" or "the occurrence of the loss in a sudden accidental manner" that the Arizona Supreme Court has indicated must be present in order to "tip the balance in favor of strict liability." At heart, Southwest complains of a defect that existed in the product at the time it was delivered. That defect remained unchanged throughout Southwest's subsequent processing of the wheat. In other words, the allegedly inferior quality of the wheat *is* the defect. In such a case, "where the loss to a defective product alone occurs in such a way as to pose no unreasonable danger of harm to person or other property, then UCC remedies will generally be appropriate and exclusive for recovery of the damage to the defective product itself." *Id.*

The Arizona Supreme Court has held that "[i]f the only loss is non-accidental and to the product itself, or is of a conse-

**6.** Likewise, the United States Supreme Court has held that such circumstances cannot constitute "other property damage" under the analogous doctrines of federal admiralty law. *See East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 867, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *see also Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 U.S. 875, 883, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997); *Sea–Land Serv., Inc. v. General Elec. Co.,* 134 F.3d 149, 154 (3d Cir. 1998).

**7.** *But see Transport Corp. of Am. Inc. v. Int'l Bus. Mach. Corp.,* 30 F.3d 953, 957 (8th Cir. 1994) (economic loss rule applied to bar tort claim where electronic disk drive integrated into computer system); *see also King v. Hilton–Davis,* 855 F.2d 1047, 1052 (3d Cir.1988)

(damage to potatoes ruined by sprout suppressant constituted loss of expected performance subject to economic loss rule); *Chicago Heights Venture v. Dynamit Nobel of Am.,* 782 F.2d 723 (7th Cir.1986) (damage to parts of building by collapsed roof was claim for purely economic loss because damage resulted from qualitative defect and cannot be deemed "property damage"); *R.W. Murray Co. v. Shatterproof Glass Corp.,* 697 F.2d 818, 829 n. 11 (8th Cir.1983) (diminution in value of building and lost rental claims barred where allegedly defective windows incorporated into building); *Minneapolis Soc'y of Fine Arts v. Parker–Klein Assocs. Architects, Inc.,* 354 N.W.2d 816, 820 (Minn.1984) (when defective bricks damaged building into which they had been incorporated, buildings were not "other property").

quential nature, the remedies available under the UCC will govern and strict liability and other tort theories will be unavailable." *Id.* at 379–80, 694 P.2d 198. Because the only damages that Southwest seeks are economic damages, *see* Compl. ¶ 74, the present case fits neatly within those circumstances identified by the Arizona courts as appropriate for the economic loss rule. Indeed, the Arizona Supreme Court cited *Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751 (3d Cir.1976), a case very much analogous to the present one, as "the perfect example" of a case for application of the economic loss rule. In *Posttape*, the plaintiff complained that severely scratched film sold by the defendant rendered the plaintiff's motion picture unuseable. In that case, the defective component film was combined with other "ingredients"—the plaintiff's film-making expertise, sets, costumers, actors, and so on—to produce a single product. Because the allegedly defective wheat was similarly combined with other ingredients to produce a single product, dog food, the Court holds that the economic loss rule applies to the case at bar. The fact that the purchased wheat would be combined with other ingredients by Southwest was a known factor to Southwest at the time of negotiation with Koch. As such, it was or should have been a subject of *contractual* bargaining.

Southwest finally attempts to circumvent the economic loss rule by asserting that the rule does not apply to non-products liability tort claims. This assertion is contrary to the case law. *See Apollo Group v. Avnet, Inc.*, 58 F.3d 477, 480 (9th Cir.1995) (applying the economic loss rule to theories of negligent misrepresentation and negligence). Southwest's attempt to state that the economic loss rule does not apply to claims of fraud fails because it only cites cases involving fraud in the inducement to a contract, not the type of fraud at issue in the present case. *See Marcus v. Fox*, 150 Ariz. 342, 344, 723 P.2d 691 (Ariz.Ct.App.1985); *Star Pacific Inv., Inc. v. Oro Hills Ranch, Inc.*, 121 Cal. App.3d 447, 176 Cal.Rptr. 546, 553 (1981).

The distinction is significant: "[W]here the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label of 'fraudulent inducement' to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine." *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So.2d 74, 77 (Fla.Dist.Ct.App.1997).

For the foregoing reasons, the Court GRANTS the motion to dismiss the Tort Claims pursuant to the economic loss rule.

### 3. *The Indemnity Claims*

Count IX of the Complaint alleges an implied indemnity clause in the Confirmation. No such term is present in the Confirmation. *See* Koch Mem.Ex. B. To the contrary, the Confirmation includes a damages provision that is silent as to indemnification and a warranty provision that expressly limits the Confirmation to express warranties. *See id.* Southwest's only argument that the Confirmation contains an implied indemnity term is that the Confirmation as defined in the Complaint only includes the front side of the agreement. As noted above, this argument is a few fleas short of a circus. Therefore, the Court grants the motion to dismiss with respect to Count IX of the Complaint.

Count VIII asserts a claim for equitable indemnity. Koch argues that Southwest is not eligible to bring a claim for equitable indemnity because under this doctrine the one seeking indemnity may not be personally at fault in any way. *See Transcon Lines v. Barnes*, 17 Ariz.App. 428, 498 P.2d 502, 509 (1972). In the manufacturer/distributor context, a plaintiff seeking indemnity must be an "innocent conduit" in the chain of distribution. *See Schweber Elec. v. National Semiconductor Corp.*, 174 Ariz. 406, 409, 850 P.2d 119 (1992). Koch argues that Southwest is not an "innocent conduit" because it arranged for transport of the wheat, stored the wheat, tested it, and used it to manufacture dog food. In response, however, Southwest notes that an indemnity may yet be pur-

sued if it engaged merely in passive negligence, such as a failure to discover a dangerous condition. *See Pioneer Roofing Co. v. Mardian Const. Co.,* 152 Ariz. 455, 733 P.2d 652 (Ariz.Ct.App.1986) (ruling under express indemnity provision). Taking the facts as pleaded, therefore, the claim for equitable indemnity cannot be dismissed on the ground that Southwest was actively negligent.

■ A different argument for dismissing the claim for equitable indemnity centers around Koch's conduct. As Koch notes, under Arizona law, a plaintiff can only seek indemnity from a party who is actively at fault. *See Chirco Constr. Co., Inc. v. Stewart Title & Trust,* 129 Ariz. 187, 189, 629 P.2d 1023 (Ariz.Ct.App.1981) ("Chirco would be entitled to indemnity from appellees, if appellees are proved to be at fault for the soil condition which caused plaintiffs' damages."). Koch argues that because it merely acted as a broker and never had physical possession of the wheat, it cannot have been an actively negligent manufacturer subject to equitable indemnity obligations. Southwest alleges, however, that Koch ordered the wrong type of wheat from Harvest and Benson. *See* Compl. ¶ 20. If ordering a lower grade of wheat resulted in a higher chance of vomitoxin, then Koch could be considered actively negligent for purposes of a motion to dismiss the claim for equitable indemnity. Although Southwest's Complaint is not a model of pleading clarity, it will suffice for purposes of the motion to dismiss.

■ One final argument against viability of the equitable indemnity claim, however, has teeth. The doctrine of equitable indemnity can only be invoked to shift liabilities that arise *in tort. See Henderson Realty v. Mesa Paving Co., Inc.,* 27 Ariz.App. 299, 300, 554 P.2d 895 (1976) ("The principles of indemnity generally apply in the tort context when one party as a matter of law bears liability to the plaintiff as the result of the negligence of another."). Because the district court in the California Litigation has dismissed all of the claims brought by Earth Elements against Koch, it cannot be said that Southwest has "become subject to tort liability for the unauthorized and wrongful conduct of another." *Id.* The California court expressly held that tort claims by Earth Elements were barred by the economic loss doctrine (as is held in the instant litigation as to Southwest's tort claims). *See* Harvest Request for Judicial Notice Isban Decl.Exs. A–E. Moreover, at the time Southwest settled with Earth Elements, only contract claims were pending against Southwest. *See id.* Ex. E. Thus, Koch cannot be liable to Southwest for its payments to Earth Elements both because the district court in California has already adjudicated Koch not liable to Earth Elements and because Southwest has not suffered a "tort liability" to Earth Elements.

Thus, the Court GRANTS the motion to dismiss with respect to the claim for implied indemnity (Count IX) and the claim for equitable indemnity (Count VIII).

### C. *Benson and Harvest's Motions to Dismiss*

If pleadings were precipitation, this litigation would be raining cats and dogs, for defendants Benson and Harvest have also filed lengthy motions to dismiss. Southwest brings the following counts against Benson and Harvest: intentional misrepresentation (Count II), negligent misrepresentation (Count III), concealment (Count IV), negligence (Count VII), equitable indemnity (Count VIII), strict products liability (Count X), negligent interference with a prospective economic advantage (Count XI), and intentional interference with prospective economic advantage (Count XII). Benson and Harvest argue that each of these claims should be dismissed.

#### 1. *Res Judicata/Issue Preclusion*

Benson and Harvest first argue that all of Southwest's claims against them should be dismissed under the doctrines of res judicata, collateral estoppel, or judicial es-

toppel. Their arguments, however, reflect a basic misunderstanding of the nature of those doctrines. In the California Litigation, Southwest was a *defendant* sued by Earth Elements. Southwest brought a counterclaim only against Earth Elements. It did not assert cross-claims against any of the defendants now bringing motions to dismiss. The law in such a situation is clear: "Federal courts generally do not apply collateral estoppel, or issue preclusion, between parties who were codefendants in the prior action. Because co-parties are usually not adversaries in fact, the prior action is not considered the 'actual, full, and fair litigation' necessary to apply collateral estoppel." *Alumax Mill Prods., Inc. v. Congress Fin. Corp.*, 912 F.2d 996, 1012 (8th Cir.1990) (citation omitted); *see also United States v. Berman*, 884 F.2d 916, 923 n. 9 (6th Cir.1989) ("Res judicata is also inapplicable as there was no adjudication between the present parties in the state trial since both ... were defendants in the state action and neither filed a cross-claim against the other."). This doctrine applies in the Ninth Circuit, as demonstrated by the following ruling:

> A review of the record demonstrates that although American and Nytco were parties to the Oklahoma suit, they were both defendants to the action filed by Howard and Dorothy Franz; neither American nor Nytco filed a cross-claim against the other. Accordingly, there was no adjudication of a cause of action between those parties. Res judicata, therefore, is inapplicable to the present action because there was no adjudication between the same parties on any cause of action let alone the same cause of action.

*American Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1147 (9th Cir.1981); *see also Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir.1985) (holding that district court improperly applied res judicata to bar claim by former co-defendant because no cross-claim was asserted in the former action).

■ Benson and Harvest nevertheless believe that Southwest's settlement with Earth Elements should bar the claims brought by Southwest in the Arizona Litigation. They argue that because the claims brought by Earth Elements against Benson and Harvest were dismissed with prejudice in the California Litigation, Southwest should be bound by the dismissal as well. At no point do Benson and Harvest explain why claims brought by *Southwest* should be treated as identical to claims formerly brought by *Earth Elements*. The fact that Southwest and Earth Elements have settled claims against each other does not render their identities indistinguishable for purposes of litigation against other parties. Although Earth Elements is the "real party in interest" for purposes of many of the claims brought in the Complaint, that is only because it has taken an assignment of *Southwest's* claims, not because it is attempting to revive its own dismissed claims. Southwest, as the direct recipient of the wheat brokered by Benson and Harvest, stands in a different position than Earth Elements and, thus, due process demands that its claims be treated separately. For this reason, the Court rejects Benson and Harvest's attempt to stretch the doctrines of claim and issue preclusion beyond their logical reach.

### 2. The Economic Loss Rule

■ In *Flory v. Silvercrest Indus., Inc.*, 129 Ariz. 574, 633 P.2d 383 (1981), the Arizona Supreme Court addressed the area of doctrinal overlap between products liability and commercial law. Plaintiffs had suffered purely economic losses due to their defective mobile home and brought claims against the manufacturer of the home, with whom they had no direct contractual relationship. The court ruled that they could not recover under either Arizona products liability or contractual warranty theories: "Although we allow recovery for 'breach of implied warranty' without privity under the theory of strict liability, plaintiffs cannot recover purely economic damages under that theory. And although we allow recovery for purely

economic damages for breach of U.C.C. warranties, plaintiffs cannot recover under that theory ... due to their lack of privity with [the] defendant." *Id.* at 579, 633 P.2d 383. Thus, at a minimum, Southwest's claims for negligence (Count VII) and strict products liability (Count X) must be dismissed because they allege only economic losses not recoverable under those theories. *See supra* Section III. B.2.

 A further question is whether the claim for negligent misrepresentation (Count III) should be dismissed under the economic loss rule. Arizona does recognize the tort of negligent misrepresentation: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.,* 154 Ariz. 307, 312, 742 P.2d 808 (1987) (quoting Restatement [Second] of Torts § 552). In *Apollo Group,* the Ninth Circuit ruled that the Arizona Supreme Court would not except claims for negligent misrepresentation from the economic loss rule. *See Apollo Group,* 58 F.3d at 480. The court also noted, however, that Arizona appears to allow negligent misrepresentation claims "by third parties against defendants with whom they were not in contractual privi-

ty." *Id.* at 480 n. 4.[8] Thus, the economic loss doctrine should not, as matter of law, be invoked to bar a properly pled claim for negligent misrepresentation or fraudulent conduct.

Pursuant to the economic loss rule then, the Court GRANTS the motions to dismiss with respect to the claims for negligence (Count VII) and strict products liability (Count X), but not the claim for negligent misrepresentation (Count III).

### 3. *Fraud Claims*

The claims for intentional misrepresentation (Count II), negligent misrepresentation (Count III), and concealment (Count IV), however, are nothing more than the claim for negligence (Count VII) under a different heading. In Count II, Southwest alleges that, contrary to the representations made on their bills of lading, Benson and Harvest provided "sample" grade wheat rather than "feed" grade. *See* Compl. ¶ 90. Southwest further alleges that Benson and Harvest knew these representations were false and made them "with the intention of inducing Southwest Pet to act and rely on those representations and warranties in connection with entering into the Purchase Contract with Koch and acceptance of the delivery of the contaminated wheat." Compl. ¶¶ 92, 93. The claims for negligent misrepresentation (Count III) and concealment (Count IV) are similarly indistinguishable from Southwest's central claim that Benson and Harvest failed to deliver the promised grade of wheat. Thus, in a world of orderly plead-

---

8. Because the cases cited by the Ninth Circuit in support of this proposition did not deal with the sale of goods among merchants or a claim for damages caused by an allegedly defective product, it is not clear that the Arizona Supreme Court would refuse application of the economic loss rule in the instant case. *St. Joseph's Hosp.* involved a claim of negligent misrepresentation by a hospital against a patient's insurance company for bad faith settlement practices. *Donnelly Constr. Co. v. Oberg/Hunt/Gilleland,* 137 Ariz. 184, 186 (1984) involved a claim of negligence brought by a building contractor against an architect.

Thus, neither of the cases cited by the Ninth Circuit involved transactions that were governed by the Uniform Commercial Code—a matter of great significance as it is the applicability of the U.C.C. that triggers the policies behind the economic loss rule. *Cf. Apollo Group,* 58 F.3d at 480 n. 4 ("This lack of privity limited the contractual remedies available to plaintiffs, rendering commercial law an inadequate framework in which to resolve plaintiffs' claims."). Nevertheless, in the interest of affording Southwest its best possible chance to survive dismissal, this Court will accept the Ninth Circuit's dicta as controlling.

ing, Southwest should have a claim against Koch and Koch should have a separate claim for contribution/indemnity against Benson and Harvest. The Arizona Supreme Court has recognized the value of encouraging such orderly litigation in the commercial context:

> The risk that a product may not perform as it should exists in every purchase transaction. A buyer who chooses his seller with care has an adequate remedy should any warranties be breached. A buyer whose seller proves to be irresponsible will understandably seek relief further afield. But to allow a nonprivity warranty action to vindicate every disappointed consumer would unduly complicate the code's scheme, which recognizes the consensual elements of commerce. Disclaimers and limitations of certain warranties and remedies are matters of bargaining. Strict-liability actions between buyers and remote sellers could lend themselves to the proliferation of unprovable claims by disappointed bargain hunters, with little discernible social benefit. Because the buyer and his seller will ordinarily have engaged in at least one direct transaction, litigation between these parties should ordinarily be simpler and less costly than litigation between buyer and remote seller. For these reasons we retain the [economic loss] rule....

*Flory,* 129 Ariz. at 579–80, 633 P.2d 383 (quoting *Western Seed Prod. Corp. v. Campbell,* 250 Or. 262, 267–68, 442 P.2d 215 [1968]). In short, one reason the Court grants dismissal of the Fraud Claims is that they are essentially identical to the negligence claim that must be precluded due to the economic loss rule.

■ An alternative reason for dismissing the Fraud Claims is that they fail to comply with the requirements of Fed. R.Civ.P. 9(b). Southwest has provided only the most general allegations of fraudulent or misrepresentative conduct on the

part of Benson and Harvest. The insufficiency of the allegations can be seen in Southwest's own argument on their behalf: "[T]he allegations identify 'who'—each defendant; 'what'—the false representations; 'when'—the specific dates the shipments of wheat were received by Southwest; and 'where'—in bills of lading and invoices accompanying each wheat shipment." Southwest Opp'n Mem. at 19. Referring to "each defendant" and "the false representations" does not suffice as matter of law to state a claim for fraud under Rule 9(b). Southwest has not identified the speaker of any representations by Benson or Harvest; it has not attempted to particularize or quote any of the alleged representations; and it has not attempted to explain how bills of lading from Benson or Harvest could constitute "representations" to Southwest when Southwest only purchased wheat from Koch. Under such circumstances, dismissal of all the Fraud Claims, including negligent misrepresentation, is appropriate. *See Atlantic Richfield Co. v. Ramirez,* 176 F.3d 481, 1999 WL 273241 (9th Cir.1999) (unpublished opinion) (affirming dismissal of fraud and negligent misrepresentation claims for failure to comply with Rule 9[b]).[9]

Thus, upon this analysis, the Court GRANTS the motions to dismiss with respect to the claims for intentional misrepresentation (Count II), negligent misrepresentation (Count III), and concealment (Count IV).

### 4. *Equitable Indemnity*

■ As noted above, *see supra* Section III.B.3, the doctrine of equitable indemnity can only be invoked to shift liabilities that arise *in tort.* Because the district court in the California Litigation has dismissed all of the claims brought by Earth Elements against Benson and Harvest, it cannot be said that Southwest has "become subject to tort liability for the unauthorized and

---

9. The Court is well aware that *Atlantic Richfield* is an unpublished opinion and, as such, is not citable as precedent under 9th Cir.

Loc.R. 36–3. *See Giese v. Pierce Chem. Co.,* 43 F.Supp.2d 98, 104 n. 1 (D.Mass.1999) (explicating the use of unpublished opinions).

wrongful conduct of another." *Henderson Realty,* 27 Ariz.App. 299, 554 P.2d 895. The California court expressly held that tort claims by Earth Elements against Benson and Harvest were barred by the economic loss doctrine. *See* Harvest Request for Judicial Notice Isban Decl.Ex. A. Moreover, at the time Southwest settled with Earth Elements, only contract claims were pending against Southwest. *See id.* Ex. E. Thus, Benson and Harvest cannot be liable to Southwest for its payments to Earth Elements both because the district court in California has already adjudicated Benson and Harvest not liable to Earth Elements and because Southwest has not suffered a "tort liability" to Earth Elements. For these reasons, the Court GRANTS the motions to dismiss the equitable indemnity count (Count VIII).

### 5. *Interference with Prospective Economic Advantage*

■ Finally, Southwest brings claims for negligent and intentional interference with prospective economic advantage (Counts XI and XII, respectively). First, as Southwest itself has previously acknowledged in its motion to dismiss the claims of Earth Elements, "there is no claim for relief for negligent interference with economic relations under the majority rule of common law jurisdictions . . . ." Benson Mem.Ex. 12. Because Southwest has cited no Arizona cases that would indicate the law is contrary to this majority rule, the Court GRANTS the motion to dismiss the claim for negligent interference with prospective economic advantage (Count XI).

■ The intentional interference claim must likewise be dismissed because it rests entirely on the allegations of defective wheat and therefore raises no issues apart from those raised in the counts for negligence and strict products liability. As such, the economic loss rule also bars the claim for intentional interference with prospective economic advantage. Because Southwest makes no effort to oppose these arguments of Benson and Harvest, the Court GRANTS the motions to dismiss Count XII.

### IV. *Conclusion*

For the foregoing reasons, the Court DENIES Koch's motion to dismiss the claims for breach of contract (Count I), express warranty (Count V), implied warranty of merchantability (Count XIII), and implied warranty of fitness (Count XIV). The Court GRANTS Koch's motion to dismiss the claims for intentional misrepresentation (Count II), negligent misrepresentation (Count III), concealment (Count IV), negligence (Count VI), the claim for equitable indemnity (Count VIII), the claim for implied contractual indemnity (Count IX), strict products liability (Count X), negligent interference with a prospective economic advantage (Count XI), and intentional interference with a prospective economic advantage (Count XII) [Docket # 183].

The Court GRANTS Benson and Harvest's motions to dismiss in their entirety [Docket # 186, 196].

SO ORDERED.