**SOUTHWEST PET PRODUCTS, INC., Earth Elements Inc., f/d/b/a Nature's Recipe Pet Foods, Real Party In Interest [1], Plaintiffs,**

v.

**KOCH INDUSTRIES, INC., Koch Agriculture, Inc., Koch Agri Services, Benson–Quinn Co., and Harvest States Cooperatives, Defendants.**

**No. CIV.A. 95–02531–PHX–RGS (WGY).**

United States District Court, D. Arizona.

June 11, 2003.

---

**1.** Earth Elements, Inc. ("Earth Elements")

sued the present defendants in a prior action

in California and lost. It made similar claims against Southwest. Southwest settled with Earth Elements; as part of the settlement, it assigned the bulk of its rights to recover here to Earth Elements. *See infra* pp. ——–——.

James A. Craft, Esq, Michael R. King, Esq, Gammage & Burnham PLC, Phoenix, AZ, L. Rachel Helyar, Akin, Gump, Strauss, Hauer & Feld LLP, Los Angeles, CA, Peter J. Mort, John W. Vineyard, David Thomas Bristow, Irena Leigh Norton, Akin, Gump, Strauss, Hauer & Feld LLP, Riverside, CA, Gary E. Cripe, Cripe & Graham, Upland, CA, for plaintiffs.

William R. Jones, Jr., Esq, James J. Osborne, Esq, David Conley Lewis, Esq, Carol Marie Romano, Jones, Skelton & Hochuli PLC, Phoenix, AZ, Richard J. Nygaard, Esq, Mark Allen Mitchell, James R. Crassweller, Rider, Bennett, Egan & Arundel LLP, Marc Andre Al, Lindquist & Vennum PLLP, Mineapolis, MN, for defendants.

*MEMORANDUM*

YOUNG, District Judge.[2]

## I. INTRODUCTION

On March 3, 2003, the sole remaining defendant in this action, Benson–Quinn Company ("Benson"), moved for summary judgment on the only surviving claim of the plaintiff, Southwest Pet Products, Inc. ("Southwest") against it: that Benson should be held strictly liable for selling Southwest vomitoxin-infected wheat. The wheat in question was subsequently used to make pet food that eventually made dogs ill.

On April 16, 2003, this Court issued an order [Docket No. 522] granting Benson's motion for summary judgment [Docket No. 485]. The following memorandum explains the reasoning behind the Court's decision.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts Regarding the Parties

Because Benson moved for summary judgment, the facts discussed below are presented in the light most favorable to Southwest and all reasonable inferences are drawn in Southwest's favor. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Southwest is an Arizona corporation that manufactures dog food for Earth Elements, a California corporation. Pls.' Response to Def.'s Factual Stmt. ("Pls.' Response") [Docket No. 502] at ¶ 1. In April 1995, Southwest contracted with Koch Industries, Inc. ("Koch") to buy 1,400 tons of "feed wheat" to use in combination with other ingredients to make dog food and to be delivered between April and June 1995. *Id.* at ¶ 3. Koch, in turn, purchased the wheat in question from Benson. *Id.* at ¶ 4. After making the deal with Koch, Benson was directed to ship the wheat directly to Southwest in Tolleson, Arizona. *Id.* The bills of lading specifically identified the buyer as Southwest and described the product as "feed wheat" or "dark northern spring wheat." Exs. A–E to Decl. of Norton [Docket No. 493]. The United States grading certificates that were sent to Southwest, however, labeled the feed clearly as "sample grade northern spring wheat." Exs. 35A–H to Def.'s Corrected Stmt. of Facts [Docket No. 501].

Before using the wheat to make pet food, Southwest had some of it tested for vomitoxin by Wasatch Laboratories, Ltd. ("Wasatch"). Pls.' Response at ¶ 22. Af-

---

**2.** Of the District of Massachusetts, sitting by designation.

ter the test results showed that less than 1 part per million ("ppm") of the wheat was tainted with vomitoxin, Southwest used the wheat to make dog food for Earth Elements. *Id.* Thereafter, several of Earth Elements' customers reported that their dogs refused to eat the dog food or became sick after eating it. *Id.* at ¶ 24.

Earth Elements recalled the dry dog food between May 17, 1995 and July 20, 1995, and Southwest cooperated with Earth Elements' efforts, resulting in labor and overhead costs to it.[3] *Id.* at ¶ 25; Pls.' Notice of Mot. for Partial Summ. J. and Summ. Adjudication ("Pls.' Notice of Mot.") [Docket No. 490] at 3. In addition, Southwest had the leftover wheat samples tested for vomitoxin. These tests showed—in contrast to the previous results—that the wheat had levels of vomitoxin over 5 ppm, with some samples as high as 34.6 ppm. Pls.' Response at ¶ 18; *see also* Lottie Dep. (Ex. P to Norton Decl.) at 55.

Southwest also tested the suspect endfood product itself. The results of the test "show[ed] the levels of DON [vomitoxin] in the final products to vary, with levels of 2–5 ppm being reported most often in the suspect products, and up to levels of 9 ppm in the NR Lamb and Rice product, which seemed to be the product line most affect-

ed." Thompson Dep. (Ex. L. to Norton Decl.) at 42.

Based upon these test results, Southwest claims that the delivered wheat did not conform to the sales contract between Southwest and Koch because Southwest had contracted for feed wheat but received sample grade, and sample grade is not suitable for making pet food for dogs. Third Amended Complaint ("Compl.") [Docket No. 198] ¶ 61.

It is undisputed that the United States grain standards do not include a classification for, or definition of, feed wheat. Southwest contends, however, that feed wheat generally refers to raw wheat that is "intended for feeding." Wilson Expert Rep. (Ex. I to Norton Decl.) at 4.[4] Southwest repeatedly states in its submissions that feed wheat means wheat suitable for use as feed for *animals* in general. *See, e.g.,* Pls.' Response [Docket No. 502] ¶¶ 6, 18; Pls.' Separate Statement of Undisputed Facts ("Pl.'s Undisputed Facts") [Docket No. 491] at ¶ 5.[5] The Court accepts this definition of feed wheat.

One of Southwest's experts further asserts that feed wheat "*should* still be subject to FDA advisory levels: otherwise it would be considered un-merchantable for its intended use." Wilson Expert Rep. (Ex. I to Norton Decl.) at 4 (emphasis

---

**3.** In testimony submitted by Southwest, it is admitted that Earth Elements even recalled and replaced several products that did not contain wheat because it wanted to calm public fears about buying the food. Behnken Dep. (Ex. H to Norton Decl.) at 42–43.

**4.** Benson admits that it contracted to provide feed wheat, but alleges (and provides expert testimony in support of this contention) that feed wheat is not an official grading standard but instead means non-milling grades of wheat including grades 4, 5, and sample grade. Def.'s Sep. Factual Stmt. [Docket No. 486] ¶ 6; Christopher Expert Rep. (Ex. 10 to Def.'s Sep. Factual Stmt.) at ¶ 3.

**5.** Although one of the experts seems to claim that feed wheat means that the wheat needed to be suitable for use *as pet food* (i.e., to conform to Southwest's specific intended use), Wilson Expert Rep. [Ex. I to Norton Decl.] at 3, that same expert later suggests that feed wheat need only be suitable for "feeding" in general, *id.* at 4. Southwest similarly defines feed wheat as wheat that is suitable for feeding animals generally, and makes no mention of pets in particular. *See, e.g.,* Pls.' Response, ¶¶ 6, 18.

added). This assertion, however, is not supported by any other testimony, and it is undisputed that the Food and Drug Administration ("FDA") advisory levels apply only to end-food product and not to raw wheat. Therefore, the Court disregards it.[6]

Southwest and Benson agree that the contract did not specify vomitoxin limits but only specified "no sour, musty, or smutty to apply." Pls.' Response at ¶ 7. Some of the expert testimony indicates that the wheat in question was sold at discounted rates relative to the cost of wheat that is subject to specific vomitoxin limits or described as "vomitoxin free." Christopher Dep. (Ex. O to Norton Decl.) at 51–53; Wilson Expert Rep. (Ex. I to Norton Decl.) at 9–11. It is unclear whether Koch alone received the benefit of the discounted rates or if some of that benefit was passed on to Southwest. Southwest has submitted expert testimony that shows that Benson's margin on the wheat was greater than normal, Wilson Expert Rep. (Ex. I to Norton Decl.) at 13, indicating that the discount on the wheat—if any—may have been lower than average.

### B. Facts Regarding Vomitoxin and Wheat [7]

Vomitoxin (also known as deoxynilvalenol and referred to as DON) is a toxin that occurs naturally in wheat as a by-product of scab infestations. *Id.* at 4; *see also* Lottie Dep. (Ex. P to Norton Decl.) at 117. During 1993 and 1994, the growing conditions in the midwest gave rise to scab infestations, and vomitoxin became prevalent. Wilson Expert Rep. (Ex. I to Norton Decl.) at 2, 4. Vomitoxin does not pose a real threat to public health among the general population, but sometimes causes acute, temporary nausea and vomiting in animals and humans. *Id.* at 4. Younger animals and animals with preexisting conditions are more vulnerable to vomitoxin's effects. Thompson Dep. (Ex. A to Pls.' Response) at 53–54. Different animals have different tolerances for vomitoxin: cattle and poultry have the highest tolerance, whereas swine and other animals are more sensitive to it. Hart Expert Rep. (Ex. K to Norton Decl.) at ¶ 4. Among normal, healthy adult dogs, the reaction to vomitoxin is "usually mild and self-limiting and can be resolved by removing the food." Thompson Dep. (Ex. A to Pls.' Response) at 53.

Although the FDA previously regulated the raw supplier, in 1993 it switched course and began regulating only vomitoxin in the *end-food product.* Hart Expert Rep. (Ex. K to Norton Decl.) at ¶ 4. The FDA regulates vomitoxin by *advising* the appropriate vomitoxin level for end-food products rather than by setting absolute limits. Wilson Expert Rep. (Ex. I to Norton Decl.) at 5; *see also* Thompson Dep (Ex. L to Norton Decl.) at 44.[8] The FDA's advisory limits for vomitoxin are 1 ppm for humans, 10 ppm for cattle and poultry, and 5 ppm for swine and all other animals. Hart Expert Rep. (Ex. K to Norton Decl.) at ¶ 4.[9]

---

**6.** *See infra* pp. 1056–1057 for a further discussion of why the Court disregards this normative assertion.

**7.** Again, these facts are presented in the light most favorable to Southwest.

**8.** The FDA reserves the right to take regulatory action against anyone who sells an end-product that significantly exceeds the limits, if that entity knowingly blended clean grain with grain contaminated with high levels of vomitoxin. Wilson Expert Rep. (Ex. I to Norton Decl.) at 5.

**9.** The FDA also advises that wheat containing vomitoxin should not make up more than 50% of the diet of cattle and poultry, 20% of swine, and 40% of all other animals. Hart Expert Rep. (Ex. K to Norton Decl.) at ¶ 4.

The FDA, by creating advisory limits on the end-product, placed the onus of compliance on the food manufacturer instead of the supplier. *Id.* at ¶ 5 (referring to *Scab of Wheat and Barley: A Re-emerging Disease of Devastating Impact*, 81 Plant Disease 1340, which states that "[t]he change in the FDA levels of concern for vomitoxin in the fall of 1993 shifted the consequences of vomitoxin contamination from the buying point to the marketplace").[10] Expert testimony introduced by Southwest in its own motion for summary judgment demonstrates that, although sellers commonly test the wheat themselves, the *only* entity with an obligation to test the wheat for vomitoxin is the buyer (in the absence of a contractually-set vomitoxin limit). Christopher Dep. (Ex. O to Norton Decl.) at 54–55; Lottie Dep. (Ex. P to Norton Decl.) at 122–23; Hart Expert Rep. (Ex. K to Norton Decl.) at 54–55.

Buying lower grade wheat increases the risk of having excessive vomitoxin in the wheat. Wilson Expert Rep. (Ex I to Norton Decl.) at 9; Hart Expert Rep. (Ex. K to Norton Decl.) at ¶ 6 ("Vomitoxin levels were associated with grain quality. Generally, the levels of vomitoxin were higher when the graded level of the wheat was lower."). The risk increases because the existence of vomitoxin is highly correlated with factors (such as damage, defects, and test weights) that are taken into account when wheat is graded. Wilson Expert Rep. (Ex. I to Norton Decl.) at 3, 9. The

presence of vomitoxin itself is not taken into account during the grading process. *Id.* at 3.

Benson has asserted and Southwest has not disputed that wheat containing vomitoxin (including the wheat it sold Southwest) is useable.[11] In 1996, the United States Department of Agriculture ("USDA") issued a press release stating that no level of vomitoxin in raw wheat can render it unmarketable because raw wheat can also be "used for industrial purposes" and there are "processes you can do that nullify the problem." Ex. 38 to Def.'s Corrected Stmt. of Facts. These processes include (1) blending the infected raw wheat with uninfected wheat to bring down the overall levels of vomitoxin and (2) using special equipment to "clean" the wheat by removing the damaged kernels that have the highest likelihood of containing vomitoxin. Lottie Dep. (Ex. 41 to Def.'s Corrected Stmt. of Facts) at 45; Christopher Dep. (Ex. O to Norton Decl.) at 12.[12] Undisputed expert testimony, proffered by Benson, claims that many processors of wheat have installed this special cleaning equipment. Lottie Dep. (Ex. 9 to Def.'s Sep. Factual Stmt.) at 3.

Expert testimony relied on by Southwest and undisputed by any other affidavits or testimony demonstrates that vomitoxin was pervasive in midwestern wheat crops (especially in Minnesota and North Dakota) in 1993 and 1994—the critical

---

10. Having referenced this article in Paragraph Five of his expert report, Hart attached the article to the report. Both Southwest and Benson included copies of Hart's expert report as part of their respective motions for summary judgment; Benson also included the article. *See* Def.'s Sep. Factual Stmt., Ex. 13 (copy of report and article).

11. Southwest only argues that the wheat is "unsuitable" for its intended use. Wilson Expert Rep. (Ex. I to Norton Decl.) at 2; Hart Expert Rep. (Ex. K to Norton Decl.) at 55.

12. Although Southwest's expert notes that it is very difficult significantly to reduce the levels of vomitoxin by separating, baking, or heating, he does not dispute the viability of blending. Hart Expert Rep. (Ex. K to Norton Decl.) at ¶ 7. It appears, although it is unclear, that "separating" is the same as cleaning. Given that this is a summary judgment motion against Southwest, the Court will assume that separating is the same as cleaning and that wheat with vomitoxin is difficult to clean.

years in this case. *See, e.g.,* Wilson Expert Rep. (Ex. I to Norton Decl.) at 2, 4; Hart Expert Rep. (Ex. K to Norton Decl.) at ¶¶ 1, 5. Not only was it pervasive, but the existence of the problem was known to "virtually anyone involved in grain marketing," such that "[t]o suggest that someone involved in the regional grain trading business was not familiar or did not expect that shipments would contain Vomitoxin would be insincere." Wilson Expert Rep. (Ex. I to Norton Decl.) at 10; *see also* Lottie Dep. (Ex. P to Norton Decl.) at 34 ("[A]nybody I knew who was in the wheat business either as a buyer or seller or both knew that there was vomitoxin issues with the spring crop that year."); Hart Expert Rep. (Ex. K to Norton Decl.) at ¶ 5 ("Any major company buying spring wheat grain grown in this region in these two years would have been aware of the potential problem due to contamination with vomitoxin.").

In fact, one of Southwest's experts calculated that during 1994, the probability was 72% that any sample of wheat from the region at issue in this case would exceed 5 ppm (inferentially, the advisory limit for dog food). Wilson Expert Rep. (Ex. I to Norton Decl.) at 3. In 1993 and 1994, the overall range of vomitoxin levels in the spring wheat from Minnesota and North Dakota went from undetected to greater than 25 ppm. Hart Expert Rep. (Ex. K to Norton Decl.) at 56. The average level of vomitoxin in the district in North Dakota from which most of the shipments in question came was 4.65 ppm in 1993 and 10.94 ppm in 1994. Wilson Expert Rep. (Ex. I to Norton Decl.) at 9. Southwest has proffered testimony that suggests that it was unusual for wheat from North Dakota to be sent to Arizona because a more natural source for wheat would be Kansas or Colorado. *See* Wilson Expert Rep. (Ex. I to Norton Decl.) at 11. It has not, however, proffered any evidence that it instructed Koch to purchase—or not to purchase—

wheat from any particular state. Nor has it proffered evidence that vomitoxin was not also a problem, at least to some degree, in other midwestern states including Kansas and Colorado.

## C. Procedural Posture

On October 12, 1995, Earth Elements filed a complaint in the United States District Court for the Southern District of California (the "California Litigation"), naming as defendants Harvest States Cooperatives ("Harvest"), Benson, Koch, and Southwest. *Southwest Pet Products, Inc. v. Koch Industries, Inc.,* 89 F.Supp.2d 1115, 1118 (D.Ariz.2000) ("*Southwest Pet I*"). In its complaint, Earth Elements alleged negligence, negligence per se, negligent interference with prospective economic advantage, strict products liability, breach of implied warranties, and equitable indemnity. *Id.* In response, Southwest filed a complaint in the United States District Court for the District of Arizona (the "Arizona Litigation"), naming Earth Elements, Koch, Benson, Harvest, and Wasatch as defendants. *Id.*

In 1996, all the defendants in the California Litigation moved to dismiss, arguing that the economic loss rule mandated that liability be limited only to breach of contract claims. *Id.* These motions to dismiss were granted on December 26, 1996. *Id.* at 1118–1119.

In November 1997, the Arizona Litigation that had initially been filed by Southwest was transferred to California. *Id.* at 1119. Shortly thereafter, Earth Elements and Southwest entered into a settlement agreement. *Id.* Pursuant to that agreement, Southwest paid Earth Elements not less than $21,000,000 in the settlement agreement, including $1,000,000 in cash and an assignment of "the vast majority" of its own potential tort recovery against

the defendants. *Id.*; *see also* Pl.'s Undisputed Facts at ¶ 27.

In 1999, the California court re-transferred the Arizona Litigation back to the District of Arizona. *Southwest Pet I,* 89 F.Supp.2d at 1119. Southwest subsequently filed a Third Amended Complaint, naming itself and Earth Elements as plaintiffs and naming Koch, Benson, and Harvest as defendants. Each of these defendants then moved to dismiss.

This Court granted these motions in part and denied them in part. In pertinent part, Southwest's strict liability claim against Benson—the subject of the instant motion—was dismissed by this Court. The Court looked to the three-factor test set out by *Salt River Project Agricultural Improvement and Power District v. Westinghouse Electric Corp.,* 143 Ariz. 368, 694 P.2d 198 (1984), for determining whether contract or tort law should define the remedies in Southwest's action and reasoned that contract law was implicated here. *Southwest Pet I,* 89 F.Supp.2d at 1124–27. The *Salt River* test considers: (1) the nature of the defect (namely, whether it posed an unreasonable danger of causing injury to person or property, in which case tort law is implicated); (2) the manner in which the loss occurred (specifically, whether it was "accident[al]" and "calamit[ous]" in nature, in which case tort law is appropriate); and (3) the type of loss or damage at issue (namely, whether persons or other property—rather than merely the product itself—were damaged, in which case tort law is implicated). *Salt River,* 143 Ariz. at 376–81, 694 P.2d 198. This Court reasoned that the gravamen of Southwest's claim was that "the wheat it received was allegedly not the quality of wheat for which it bargained," and ruled that the economic loss rule and, therefore,

contract law applied because the alleged loss did not pose an unreasonable danger to persons or other property, was not "accidental" or "calamitous" in nature, and related only to the product (the wheat) itself. *Southwest Pet I,* 89 F.Supp.2d at 1124–27.

Subsequently, in an unpublished opinion, the Ninth Circuit reversed this Court's dismissal of Southwest's claim for strict products liability and remanded for further proceedings. *Southwest Pet Products, Inc. v. Koch Industries, Inc.,* 32 Fed.Appx. 213, 217 (9th Cir.2002) ("*Southwest Pet II*"). Specifically, the Ninth Circuit held that Southwest had properly pled a claim of strict liability under the three-factor *Salt River* test. *Id.* at 216. The court explained that Southwest had satisfied the first factor by alleging that the wheat was unreasonably dangerous due to vomitoxin that made dogs ill, and that Southwest had satisfied the third factor by alleging that damage occurred to *other* property (e.g., storage bags and other food ingredients). *Id.* at 216.[13] The court stated that the loss alleged by Southwest had not occurred in a sudden or accidental manner, and had thus failed to satisfy *Salt River's* second factor, but ruled that the first and third factors were sufficiently satisfied to trigger the application of tort law. *Id.* The Ninth Circuit also noted that Southwest had abandoned its claim for equitable indemnity and all other tort causes of action except the strict liability claim. *Id.* at 215.

After the Ninth Circuit's decision, Southwest settled with Koch. That left only Southwest's strict products liability claim against Benson (the sole remaining defendant), in which Southwest seeks $76,900,000 in damages from Benson. Pl.'s Undisputed Facts at ¶ 27.

---

13. The Ninth Circuit noted, however, that "the final determination as to whether this defect is in fact an 'unreasonably dangerous' defect will be made by the trier of fact." *Id.* at 216 n. 2.

On March 3, 2003, Southwest moved for partial summary judgment against Benson. Pl.'s Notice of Mot. Southwest alleged that no issues of material fact existed, aside from the calculation of damages and the assessment of whether Southwest is entitled to punitive damages (and if so, how much). *Id.* at 1–2 Southwest also moved for summary judgment as to two other issues, viz. 1) the (alleged) lack of merit of Benson's twenty alleged affirmative defenses; and 2) the reasonableness of Southwest's settlement with Earth Elements. *Id.*

Also on March 3, 2003, Benson made a cross-motion for summary judgment against Southwest on four grounds: (1) the raw wheat (although it contained vomitoxin) was not defective or unreasonably dangerous; (2) Southwest's settlement with Koch precludes recovery from Benson; (3) the Ninth Circuit's opinion restricts the amount of damages that Southwest can claim, by limiting the damages to the cost of the damage to the "other property"; and (4) the economic loss rule bars the claim. Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Mem. in Support") [Docket No. 484] at 3. In its memorandum in opposition to Southwest's motion for summary judgment, Benson named several additional grounds upon which it sought summary judgment: (5) Southwest broke the chain of causation by testing the wheat; (6) the two year statute of limitations precludes Southwest's claim; and (7) Benson could not be held liable for punitive damages because no reasonable jury could find that Benson acted with the requisite "evil mind" to trigger punitive damages. Def.'s Mem. in Opp'n [Docket No. 499] at 7–9, 11–12, 13–16.[14]

On April 8, 2003, this Court held a hearing on both summary judgment motions. It denied Southwest's motion for summary judgment and took Benson's motion under advisement. On April 22, 2003, this Court entered an order allowing Benson's motion for summary judgment and explaining that this opinion would follow.

## III. DISCUSSION

### A. Standard of Review

Summary judgment is warranted if, after the facts are reviewed in the light most favorable to the nonmoving party, no genuine issues of material fact remain. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. In making its determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.* The movant has the initial burden of production; this burden can be met either by offering evidence to disprove an element of the plaintiff's case or by showing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (internal quotation marks omitted).

---

**14.** Benson also moved for summary judgment on Earth Elements' strict liability claim against it, alleging that Earth Elements—as a partial assignee of any recovery received by Southwest from Benson—did not have an independent action against Benson. Def.'s Mem. In Support at 17.

## B. Benson's Motion for Summary Judgment

To establish a prima facie case for strict products liability in Arizona, a plaintiff must show that the product was in a defective condition (when it left the defendant's hands), that the defect made the product unreasonably dangerous, and that the defect was a proximate cause of plaintiff's injuries. *Jimenez v. Sears, Roebuck and Co.*, 183 Ariz. 399, 402, 904 P.2d 861 (1995). There are three categories of defects in strict products liability actions: manufacturing defects; design defects; and informational defects in regard to instructions and warnings. *Piper v. Bear Medical Systems, Inc.*, 180 Ariz. 170, 173–74, 883 P.2d 407 (Ariz.Ct.App.1993). The Supreme Court of Arizona has made clear that proof of the defect alone is not sufficient for liability. *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 447, 719 P.2d 1058 (1986). Instead, "[s]trict liability in tort is found only where the defective condition causes the product to be unreasonably dangerous." *Id.* (internal quotation marks omitted).

Southwest claims that it has made out a prima facie case for strict liability against Benson. It argues that Benson should be held strictly liable because the wheat Benson supplied was defective *and* unreasonably dangerous. Pl.'s Notice of Mot. at 8–9. Southwest alleges that the wheat had both a manufacturing defect[15] and an informational defect. In support of the manufacturing defect theory, it argues that the wheat contained vomitoxin at levels up to 34.6 ppm, a condition known to be harmful to dogs because the FDA "has set advisory levels calling for no more than 5 ppm vomitoxin in the diet of pets," and because one of Southwest's own experts has testified that "consumption of wheat containing vomitoxin at levels over 4.5 ppm makes pets sick." *Id.* at 8. Southwest claims this defect made the product unreasonably dangerous because "no pet food manufacturer would reasonably expect the wheat it commissioned for making pet food to poison animals." *Id.* at 8–9. In support of the informational defect theory, Southwest alleges that Benson "knew or had reason to believe the wheat was contaminated but failed to warn" Southwest, thereby rendering the product defective and unreasonably dangerous. *Id.* at 5, 10–11.

As noted above, Benson moved for summary judgment on Southwest's strict liability claim, arguing that the raw wheat containing vomitoxin was neither defective *nor* unreasonably dangerous. Def.'s Mem. in Support at 3; Def.'s Mem. in Opp'n at 2–3. Specifically, Benson argues that the wheat was not unreasonably dangerous because it fails the consumer expectation test. *Id.* at 3–4. In other words, Benson claims that the wheat was not "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) Torts § 402A, cmt. i (1965). As such, Benson claims it therefore had no duty to warn Southwest. In short, Benson argues that, on the record before the Court, no jury could find it strictly liable for the

---

15. Although neither a manufacturing or design defect claim fits the case at hand perfectly, Southwest has argued that the wheat was defectively manufactured. The Court agrees that the manufacturing defect theory fits this case more closely than would a design defect claim. *See Gomulka v. Yavapai Mach. and Auto Parts, Inc.*, 155 Ariz. 239, 241–42, 745 P.2d 986 (Ariz.Ct.App.1987) ("A defectively manufactured product is one that is flawed as a result of something that went wrong during the manufacturing process. A defectively designed product is one that is made as the manufacturer intended it to be but that is unreasonably dangerous.").

wheat it provided to Southwest. Def.'s Mem. in Support at 7, 17.

### 1. Is Wheat Containing Vomitoxin at the Levels Present Here Defective?

█ Benson argues, preliminarily, that strict products liability does not apply to wheat because wheat is a commodity rather than a "manufactured" product, and that therefore, it cannot be defective because vomitoxin is a "naturally occurring condition in the wheat," rather than a result of "something that went wrong during the manufacturing process." Def.'s Mem. in Support at 5, 6, 16.

This argument is frivolous at best.[16] The Restatement (Second) of Torts, followed in Arizona, does not limit strict products liability to products that are "manufactured." *See* Restatement (Sec-

ond) Torts § 402A (1965); *Dart v. Wiebe Manufacturing, Inc.*, 147 Ariz. 242, 244, 709 P.2d 876 (1985) (relying on the Restatement (Second) of Torts to define "defective"); *Scheller v. Wilson Certified Foods, Inc.*, 114 Ariz. 159, 162, 559 P.2d 1074 (Ariz.Ct.App.1976) (same). On the contrary, the Restatement makes clear that strict products liability applies to suppliers of articles that have not undergone any processing, such as "the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated." Restatement (Second) of Torts § 402A, cmt. e (1965). *See also* Restatement (Third) of Torts § 19, cmt. b (1998) ("Most courts treat raw materials as products for the purposes of strict products liability in tort, provided that the injury resulted from an identifiable defect in the raw material.").[17]

---

**16.** Benson does not appear to be making, as the Court does *infra* n. 26, a specific analogy between vomitoxin in wheat and bacteria in shellfish or bones in fish. Rather, it appears to be making the general argument that naturally-occurring conditions can never give rise to strict products liability. Thus, this argument *as presented* to the Court lacks substance and support.

**17.** The Supreme Court of Arizona (and other Arizona courts) have relied on the Restatement (Third) of Torts to determine the current state of the law on strict products liability and consider it relevant to today's tort law regime. *See e.g., Jimenez v. Sears, Roebuck and Co.*, 183 Ariz. 399, 405, 904 P.2d 861 (1995) (looking to the Restatement (Third) of Torts §§ 10, 12 to provide "substantial authority" for applying comparative fault principles to strict liability defenses); *Gebhardt v. Mentor Corp.*, 191 F.R.D. 180, 185 (D.Ariz.1999) ("Although no Arizona case has formally adopted the Restatement (Third) of Torts, Arizona has demonstrated a willingness to look to the Restatement (Third) as the current statement of the law."); *Golonka v. General Motors Corporation*, 204 Ariz. 575, 65 P.3d 956 n. 3 (Ariz. Ct.App.2003); *Fehribach v. Smith*, 200 Ariz. 69, 72 n. 1, 22 P.3d 508 (Ct.App.2001); *Lowrey v. Montgomery Kone, Inc.*, 202 Ariz. 190,

192 n. 4, 42 P.3d 621 (Ct.App.2002); *Winsor v. Glasswerks PHX*, 204 Ariz. 303, 63 P.3d 1040, 1045, 1050 (Ct.App.2003).

This reliance on Restatement (Third) of Torts is in keeping with Arizona's longstanding policy to look to the Restatement absent contrary precedent. *See e.g., MacNeil v. Perkins*, 84 Ariz. 74, 324 P.2d 211, 215 (1958) (relying on Restatement (One) of Torts and noting that "in the absence of prior decisions to the contrary, this court has consistently followed the application of the Restatement of the Law of Torts"); *Radcliffe v. Hilton Inn*, 119 Ariz. 306, 308, 580 P.2d 767 (Ariz.Ct.App. 1978) ("Where there is no Arizona case in point, ... the rule is that, in the absence of prior decisions and statutes to the contrary, the courts of Arizona will follow the Restatement of the Law whenever applicable."); *Aztlan Lodge No. 1, Free and Accepted Masons of Prescott v. Ruffner*, 155 Ariz. 163, 165, 745 P.2d 611 (Ariz.Ct.App.1987) (same); *Dole Food Co., Inc. v. North Carolina Foam Indus., Inc.*, 188 Ariz. 298, 306, 935 P.2d 876 (Ariz. Ct.App.1996) (same). Like the Arizona courts, both parties in this case rely on the Restatement (Third) of Torts to make their arguments. *See, e.g.,* Pl.'s Notice of Mot. at 7; Def.'s Reply Mem. in Support [Docket No. 508] at 10.

Moreover, under Arizona law, a products liability action refers to "any action brought against a manufacturer or seller of a product for damages for bodily injury, death, or property damage caused by or resulting from the manufacture ... *sale, use* or *consumption of any* product." Ariz.Rev.Stat. § 12–681(3) (emphasis added).[18] Therefore, despite Benson's claim to the contrary, a product *can* be defective even if it "was not the result of something that went wrong during the manufacturing process." Def.'s Mem. in Support at 6. This is consistent with the view that strict products liability is "founded in the special responsibility for public safety assumed by those who carry on the business of supplying products that may endanger person or property, coupled with a forced public reliance upon the suppliers." *Bailey v. Montgomery,* 6 Ariz.App. 213, 216, 431 P.2d 108 (1967).

As noted above, the Arizona Supreme Court has stated that, in order for strict products liability to apply, the product must be found both defective *and* unreasonably dangerous. *See Readenour,* 149 Ariz. at 447, 719 P.2d 1058. This Court will not, however, separately address whether the wheat containing vomitoxin that Benson delivered to Southwest was defective, but will instead move directly to an assessment of whether it was unreasonably dangerous. The Court takes this path for three reasons.

First and foremost, whether the wheat was defective is not determinative here. Even were the Court to rule that the wheat containing vomitoxin was defective as matter of law, it would also still have to rule that a jury could find it unreasonably dangerous under the consumer expectation test before it could hold that Southwest made out a prima facie case for strict products liability. *See, e.g., Maas v. Dreher,* 10 Ariz.App. 520, 522 n. 1, 460 P.2d 191 (1969) ("In view of our conclusion that the product was not unreasonably dangerous, we do not deem it necessary to discuss the question of whether ... the [product] was in a defective condition within the meaning of Sec. 402A.").

Second, Arizona's primary purpose in retaining the two-part test is to ensure that the fact finder will not skip the "unreasonable danger" prong of the test and "decide that any product which causes an injury is defective," thus converting "products liability law into absolute liability." *See, e.g., Dart,* 147 Ariz. at 244 n. 1, 709 P.2d 876; *Byrns v. Riddell, Inc.,* 113 Ariz. 264, 267, 550 P.2d 1065 (1976) (noting that the "unreasonable danger" concept "is especially effective as a means of limiting the strict tort liability doctrine in cases in which the issue is the nature of the duty of a manufacturer with respect to safe design, or in situations in which injury does not follow as a matter of course from the defect ....") (internal citations and quotation marks omitted).[19] No danger, there-

18. Benson's counsel incompletely · and misleadingly quotes this statute. Counsel quotes Ariz.Rev.Stat. § 12–681(3) as stating that "a product liability action may be brought 'against a manufacturer or seller of a product for damages ... resulting from the manufacture.'" Def.'s Mem. in Support at 5. In so doing, counsel implies that the sentence ends there. As noted above, however, the statute actually goes on to state that such damages can also result from the *use* of the product. The attorney's error is at least negligent, if not unethical.

19. Other states (including California) have eliminated the "unreasonably dangerous" part of the test on the theory that it adds nothing to the concept of "defective." *Dart,* 147 Ariz. at 244 n. 1, 709 P.2d 876 (noting that California eliminated the "unreasonably dangerous" requirement because the Restatement defines " 'unreasonably dangerous' " as a condition "which will be unreasonably dangerous").

fore, is presented by the Court's decision to bring the "unreasonable danger" assessment to the forefront.

Third, although the Supreme Court of Arizona has stated that "there is a difference between the two concepts," *Readenour*, 149 Ariz. at 446–47, 719 P.2d 1058, the defectiveness and unreasonable danger assessments are often intertwined. For example, the Restatement (Second) of Torts states that a product is in a defective condition if it is "in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." § 402A, cmt. g (1965). *See also id.* cmt. h (explaining that a product is not defective if it is "safe for normal handling and consumption"). The Restatement (Third) of Torts explains that manufacturing defects—products that are flawed, damaged, or assembled incorrectly—"[m]ore distinctly than any other type of defect, ... disappoint consumer expectations." Restatement (Third) of Torts § 2, cmt. c (1998). Thus, the question of whether a product is defective is connected to what consumers expect; consumer expectations, in turn, also determine whether a product is unreasonably dangerous. *See infra* pp. 1054–1055.

Accordingly, Arizona courts often collapse the two-part test into one inquiry. For example, in *Golonka v. General Motors Corp.*, the Arizona Court of Appeals stated that "[u]nder the consumer expectation test, the fact-finder determines whether the product failed to perform as safely as an ordinary consumer would expect.... If so, the product was in a defective condition and unreasonably dangerous."204 Ariz. 575, 65 P.3d 956, 962 (2003) (internal citations and quotation marks omitted). The Ninth Circuit has also collapsed the two prongs by implying that if "a product is unreasonably dangerous within the meaning of section 402A," it is "therefore defective." *d'Hedouville v. Pioneer Hotel*

*Co.*, 552 F.2d 886, 892 (9th Cir.1977) (applying Arizona law).

Moreover, as will be discussed in greater length, this case can be analogized to those that involve defects in food products (e.g., bacteria in raw clams, bones in fish) where the consumer expectation test is the only relevant inquiry. *See infra* n. 1054. Here, as in those cases, the potential defect is a naturally-occurring condition. When determining whether a food product containing a dangerous but natural component is defective, the majority view is that the defectiveness issue turns on "reasonable consumer expectations within the relevant context of consumption." Restatement (Third) of Torts: Products Liability § 7 cmt. b (1998). In other words, consumer expectations determine whether the product has an unreasonably dangerous defect. Although consumer expectations may not provide an adequate standard for defectiveness in many other instances, "assessments of what consumers have a right to expect in various commercial food preparations are sufficiently well-formed that judges and triers of fact can sensibly resolve whether liability should be imposed using this standard." *Id.*

For these reasons, the Court will not address separately whether the wheat containing vomitoxin that Benson provided to Southwest was defective as matter of law. Instead, it will focus on the heart of the matter—whether the product was unreasonably dangerous.

### 2. Is Wheat Containing Vomitoxin Unreasonably Dangerous Under the Consumer Expectation Test?

Arizona follows the definition of an unreasonably dangerous product provided by the Restatement (Second) of Torts. *Dart*, 147 Ariz. at 244, 709 P.2d 876. The Restatement defines a product as unreasonably dangerous when it fails the consumer expectation test, that is, when it is

"in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts § 402A, cmt. g (1965); *see also id.* § 402A, cmt. i ("The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."). Likewise, the Supreme Court of Arizona has defined an unreasonably dangerous product as "one which is more dangerous than a consumer would expect." *Readenour*, 149 Ariz. at 447, 719 P.2d 1058.[20]

Southwest submits—and Benson agrees—that the "ultimate" or ordinary consumer in this case is the ordinary pet food manufacturer. *See, e.g.,* Pl.'s Notice of Mot. at 8 ("Because no pet food manufacturer would reasonably expect ...."). The fundamental question, therefore, is: Would an ordinary pet food manufacturer that contracted for feed wheat have expected the wheat it received to contain vomitoxin at levels above 5 ppm and as high as 34.6 ppm?

As a preliminary matter, the record clearly indicates that any ordinary pet food manufacturer, including Southwest, would have expected the presence of at least some vomitoxin in feed wheat that was purchased from the 1993–1994 midwestern crops. Expert testimony, proffered by Southwest and undisputed by any other affidavits or testimony, indicates that vomitoxin was pervasive in midwestern wheat crops (especially in Minnesota and North Dakota) in 1993 and 1994—the critical years in this case. *See supra* pp. 1047–1048. Not only was it pervasive, but testimony from Southwest's *own* expert witnesses indicates that the problem was "common knowledge" among buyers and sellers alike. *See* Hart Expert Rep. (Ex. K to Norton Decl.) at ¶ 5 ("Any major company buying spring wheat grain grown in this region in these two years would have been aware of the potential problem due to contamination with vomitoxin."); Wilson Expert Rep. (Ex. I to Norton Decl.) at 2 ("There was no secret that Vomitoxin was a problem. In fact, there was common knowledge of the problem ....").

Further supporting this conclusion is the expert testimony, submitted by Southwest, that vomitoxin in the wheat was not merely a "possibility" (as Southwest argues) but a *probability*. As noted above, one of Southwest's experts calculated that, during 1994, the probability that *any* sample of wheat from the region at issue in this case would exceed the 5 ppm advisory limit for dog food was 72%. *Id.* at 3. Arguably, this probability would increase for pet food manufacturers who bought lower grade wheat such as feed wheat—which is what Southwest expressly sought—because buying lower grade wheat increases the risk of excessive vomitoxin being present in the wheat. *See supra* pp. 1047–1048.

As such, the Court rules that it is clear beyond dispute that the ordinary consumer (pet food manufacturers like Southwest) would have expected there to be some vomitoxin in feed wheat that was purchased from the 1993–1994 midwestern crops. Southwest seems to think that Benson is required to make an affirmative showing as to the common knowledge regarding vomitoxin. Pl.'s Revised Reply [Docket No. 511] at 6. Instead, Benson need only show an "absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. On this issue, Benson has more than met its burden. Therefore, Southwest, as the

20. The parties and the Court agree that the consumer expectation test—as opposed to the risk/benefit test—should be used to determine whether the wheat that Benson supplied was unreasonably dangerous. Pl.'s Notice of Mot. at 6, 8–9; Def.'s Mem. in Opp'n at 4.

non-moving party, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a material issue for trial." *Id.* at 324, 106 S.Ct. 2548 (internal quotation marks omitted).

Southwest has not done this. One of Southwest's experts did claim that it was rare for shipments to travel from eastern North Dakota to the Southwest. Wilson Expert Rep. (Ex. I to Norton Decl.) at 11. That does not suggest, however, that the plague of vomitoxin in the midwest was unknown to the wheat-purchasing public in general or to pet food manufacturers specifically. In fact, this same expert conceded that "there was common knowledge of the [vomitoxin] problem." *Id.* at 2. Moreover, as noted above, Southwest has conceded that the objective consumer in this case is the ordinary pet food manufacturer. Southwest has never suggested that the expectation test should be geared to the ordinary pet food manufacturer *located in Arizona,* and the Court declines to adopt such a view.

In addition, the Court notes that this is a market that discounts lower-grade wheat and in which buyers know they must specify and pay more for higher-grade wheat or vomitoxin limits. Therefore, it strains common sense to argue that, during the time period in question, a buyer who specified neither a particular grade, nor the

location from which the wheat should be purchased, would not have expected that the wheat would come from the midwest—the Feed Grains and Livestock Belt, formerly known as the Corn Belt. *See* Columbia Encyclopedia, 6th Edition. There has certainly been no evidence presented indicating that vomitoxin was not a problem, at least to some degree, in the midwest generally. On the contrary, the testimony of Southwest's expert that the vomitoxin problem was merely "*worst* in the geographic area where this wheat originated," that is, North Dakota, implies that the problem was also in existence in other areas. Wilson Expert Rep. (Ex. I to Norton Decl.) at ¶ 2 (emphasis added).

Having ruled that ordinary pet food manufacturers expected there to be at least *some* vomitoxin in feed wheat purchased from the 1993–94 midwestern crops, the Court must now determine whether an ordinary pet food manufacturer, knowing this and contracting for feed wheat, would have expected vomitoxin *in excess of 5 ppm* in the wheat it received.

■ Southwest argues that an ordinary pet food manufacturer that contracts for feed wheat would not expect the wheat it received to have vomitoxin at levels above 5 ppm (and as high as 34.6 ppm)—a level that, in the end-product, can cause dogs to become ill. Pl.'s Notice of Mot. at 8–9.[21] It bases this argument on the fact that the FDA advisory guidelines for vomitoxin in

---

**21.** Southwest argues that Benson knew it was shipping the wheat to a pet food manufacturer because Benson shipped product directly to Southwest pursuant to a bill of lading stating "Southwest Pet Products, Inc." Pl.'s Notice of Mot. at 10. This is immaterial. In today's market, where companies like Unilever manufacture food, home care, and personal products, a company's name is not necessarily indicative of the company's line of business. Moreover, in strict products liability, "it is not the conduct of the manufacturer or designer which is primarily in question, but rather the quality of the end result;

the product is the focus of the inquiry." *Dart,* 147 Ariz. at 247, 709 P.2d 876; *Golonka,* 65 P.3d at 963 ("[T]he focus of inquiry in strict liability design cases is whether the *product* was unreasonably dangerous, while the focus in negligent design cases is whether the manufacturer's *conduct* was unreasonable in light of the foreseeable risk of injury."); *Lunt v. Brady Mfg. Corp.,* 13 Ariz.App. 305, 307, 475 P.2d 964 (1970) (finding a portion of the instruction as prejudicially erroneous because it "focuses on the conduct of the seller rather than on the product and the expectations of the consumer").

final animal food is 5 ppm for dogs and 10 ppm for other animals. *Id.* at 8. Therefore, a great majority of the wheat that Southwest received did not comply with the FDA guidelines.

This argument is deeply flawed. First, FDA guidelines are advisory guidelines aimed at the *final* food product, not the raw wheat itself. *See supra* pp. 1046–1047. Southwest itself implicitly concedes this by stating that the FDA guidelines are for "the diet of pets." Pl.'s Notice of Mot. at 8. Thus, vomitoxin in *raw* wheat— *at any level*—neither violates any government regulations, nor is it considered when grading the wheat.[22] Southwest has not adduced any evidence indicating that the relevant consumer group (pet food manufacturers) considered the FDA guidelines to apply to raw wheat or expected that raw wheat would comply with them. Southwest merely proffers the statement of one expert, stating that "feed wheat must conform to its intended use, that being feed wheat" and, therefore, it "*should* still be subject to FDA advisory levels." Wilson Expert Rep. (Ex. I to Norton Decl.) at 4 (emphasis added).

This so-called "expert" opinion—advanced in the subjunctive voice—is norma-

tive only, trenches on matters of law properly left to the Court, and demonstrates no adequate foundation from which to infer the common expectations of the pet food industry. Hence it ought not morph into a positive claim about what relevant consumers actually expect. Southwest has adduced no support for the idea that ordinary pet food manufacturers expect that inapplicable FDA guidelines will be complied with nonetheless in this sort of transaction. Although testing by the seller was apparently a common practice, the FDA regulatory regime—by targeting the manufacturers of the end-product—puts the onus for vomitoxin testing squarely on the *buyers* (the pet food manufacturers). *See supra* pp. 1046–1047. Southwest has not adduced any facts to rebut the logical conclusion that pet food manufacturers therefore understand that in order to ensure that their pet food does not contain excessive levels of vomitoxin, they must either pay the premium dictated by the market for a vomitoxin limit in the wheat or test the raw wheat themselves. Indeed, Southwest obviously understood this burden given that it tested the wheat before using it.[23]

---

22. For that matter, vomitoxin in the final product also violates no federal regulation because the guidelines are advisory. That being said, as noted earlier, the FDA reserves the right to take regulatory action against anyone who sells an end-product that *significantly exceeds* the limits if they had *knowingly* blended grain contaminated with high levels of vomitoxin with clean grain. *See supra* n. 8.

23. This obviously supports the conclusion that Southwest, itself, expected the feed wheat for which it contracted to contain vomitoxin. As this Court noted in *Southwest Pet I,* 89 F.Supp.2d at 1122, Southwest is an "experienced processor of wheat into pet products," and, therefore, it "knew that there was a possibility that purchased wheat would be infected" with vomitoxin. Presumably, it is that knowledge "that prompted Southwest to send the wheat to Wasatch for testing." *Id.*

The Court recognizes that the standard outlined in comment i of the Restatement and cited by the Supreme Court of Arizona is an objective one that considers what the "ordinary consumer" with "ordinary knowledge common to the community" would expect and do. Restatement (Second) of Torts § 402A, cmt. i (1965); *d'Hedouville,* 552 F.2d at 892 (stating that the "subjective knowledge of the injured person or of any other particular individual or entity" was not relevant in determining whether the product was more dangerous than contemplated by the ordinary consumer and, therefore, defective); *Maas,* 10 Ariz.App. at 522–23, 460 P.2d 191 (explaining that the test for whether a product is unreasonably dangerous is an objective test and is not determined by plaintiffs' subjective appreciation of danger).

Second, as noted above, even when testing does reveal excessive vomitoxin, all is not lost on the part of the pet food manufacturer. The record shows that sample grade wheat containing vomitoxin at levels higher than the FDA limit for animal food (levels up to 34.6 ppm) can, after blending, produce an end-product that meets the FDA guidelines for animal food. Undisputed expert testimony indicates that such wheat can be—and often is—blended with clean wheat to lower the vomitoxin to acceptable levels. *See supra* p. ——. This is one of the principal reasons the United States Department of Agriculture has stated publicly that no level of vomitoxin renders wheat unmarketable. *See id.* This case itself proves the point. Most of the dog food about which consumers complained here had levels of vomitoxin between 2 and 5 ppm with none higher than 9 ppm. Thompson Dep. (Ex. L. to Norton Decl.) at 42. Thus, the wheat in question was blended to make an end-product that fell within the FDA advisory guidelines for animal food in general—the standard for feed wheat as defined by Southwest.[24]

Although the Court, at this stage, must consider the entire record and make all reasonable inferences in Southwest's favor, Southwest simply has failed to produce any evidence showing that consumers in the pet food industry expected that sample-grade raw wheat, when bought as "feed wheat," would comply with the FDA guidelines. Nor has it supported the idea that raw feed wheat containing levels of vomitoxin up to 34.6 ppm is beyond consumer expectations. Moreover, Southwest has not shown that such wheat cannot be blended to make animal food that is in compliance with the FDA guidelines. Thus, no reasonable jury could find the wheat in question here was unreasonably dangerous. In other words, a reasonable jury could *not* objectively find that wheat containing vomitoxin in excess of 5 ppm or in excess of the maximum level that the FDA says is safe for certain animals (10 ppm) was dangerous to an extent beyond that which would be contemplated by the ordinary pet food manufacturer contracting for feed wheat in 1995. The very fact that consumers sometimes contract specifically for vomitoxin-free wheat or vomitoxin limits (which Southwest did *not* do) suggests that they fear they will otherwise receive vomitoxin-infested wheat.

 The consumer expectations aspect of strict products liability is, of course, usually a matter for the jury. David G. Owen, *Manufacturing Defects*, 53 S.C. L.Rev. 851, 900–901 (2002).[25] That being said, "reasonable consumer expecta-

---

The Court also notes, however, that the Supreme Court of Arizona has itself considered the subjective knowledge of plaintiffs—in conjunction with its assessment of the ordinary community knowledge—in determining whether a product is unreasonably dangerous. *See Scheller*, 114 Ariz. at 162, 559 P.2d 1074 ("Not only is it common knowledge that pork is not to be eaten raw, but in addition there was testimony that the Schellers, Stanley's, and Wilson all knew that in order to kill any trichina larvae and eliminate the danger of trichinosis, pork products had to be cooked thoroughly before they were eaten."). As in *Scheller*, here Southwest knew that in order to eliminate the danger of making pet food with excessive levels of vomitoxin and to de-termine the necessity of any further precautionary measures, it had to test the wheat. Following the *Scheller* court's lead, the Court considers Southwest's apparent knowledge of the danger of vomitoxin to be somewhat relevant here, although certainly not determinative or necessary to the Court's decision.

**24.** This is true because the maximum for cattle and poultry is, as noted earlier, 10 ppm.

**25.** As noted earlier, the Ninth Circuit stated in a footnote that "the final determination as to whether this defect is in fact an 'unreasonably dangerous' defect will be made by the trier of fact." *Southwest Pet II*, 32 Fed.Appx. at 216 n. 2.

tions sometimes are so clear that courts should take the issue from the jury." *Id.*[26] Doing so is particularly appropriate when, as here, there already exists federal regulation on the subject, and a finding in the plaintiff's favor would impose further requirements not mandated by the federal government, that is, by making applicable to raw feed wheat the advisory limits regarding the end food-product. *See Scheller*, 114 Ariz. at 166, 559 P.2d 1074 ("In view of the extensive federal regulation

concerning the inspection and treatment of pork products, and especially in light of the specific exception granted for raw pork intended for future cooking from the requirements of treatment for trichinae, it would seem inappropriate for this court to step into this area and impose additional and possibly conflicting inspection of treatment requirements."). Accordingly, the Court granted summary judgment in Benson's favor on Southwest's manufacturing defect claim against it.[27]

**26.** The situation here can be likened to cases in which courts have indeed taken the consumer expectation test from the jury. For example, courts have held as matter of law that consumers should expect clam shells in strips of fried claim, oyster shells in fried oysters, one-centimeter bones in a fish fillet, fish bones in fish chowder, and bacteria in raw clams. *See* Owen, *Manufacturing Defects*, 53 S.C. L.Rev. at 901. In these cases, the "naturalness" of the substance found in the food product is a key factor in "determin[ing] ... whether consumers may reasonably expect to find such substances in the particular type of dish or style of food." *Ex Parte Morrison's Cafeteria of Montgomery, Inc. v. Haddox*, 431 So.2d 975, 978 (Ala.1983); *Zabner v. Howard Johnson's, Inc.*, 201 So.2d 824, 826 (Fla.Dist.Ct.App.1967) (same); *Webster v. Blue Ship Tea Room, Inc.*, 347 Mass. 421, 426, 198 N.E.2d 309 (1964) (Reardon, J.) ("We should be prepared to cope with the hazards of fish bones, the occasional presence of which in chowders is, ... to be anticipated, and ... do not impair their fitness or merchantability."). Although these decisions involve end-food products, as opposed to an entity like raw wheat that needs to be further processed before being eaten, the reasoning is instructive here.

Southwest argues that the food is adulterated within the meaning of Section 36–904 of the Arizona code. Pl.'s Revised Reply at 6. The Court disagrees.

First, the relevant statute is Ariz.Rev.Stat. § 3–2611, because it is this statute that specifically addresses animal feed. Under Ariz.Rev.Stat. § 3–2611(B)(1), feed is deemed adulterated if "[i]t bears or contains any poisonous or deleterious substance which may render it injurious to health, *but in case the substance is not an added substance, such commercial feed shall not be considered adulterated under*

*this section if the quantity of such substance in such commercial feed does not ordinarily render it injurious to health"* (emphasis added). As such, there is a higher standard for finding adulteration when, as here, the substance is naturally-occurring. Here, the record indicates that vomitoxin in wheat does not *"ordinarily* render [wheat] injurious to health" (emphasis added). As noted above, expert testimony shows that vomitoxin generally does not pose a real threat to public health but *sometimes* causes acute, temporary nausea and vomiting in animals and humans. *See supra* pp. 1045–1046. In healthy dogs, the side effects are "usually mild and self-limiting." *See supra* p. 1046.

**27.** Benson also made two other arguments for why the wheat in question was not unreasonably dangerous, both of which the Court rejects. First, Benson argued that the wheat was not unreasonably dangerous *as to Southwest*, and that "whether dog owners would have a cause of action in strict liability is irrelevant to whether Southwest has one." Def.'s Mem. in Support at 16, n. 3. The Ninth Circuit has made clear, however, that "[e]ven though Southwest is not suing on behalf of the dogs or their owners, the damage it has alleged—contamination to other food ingredients and storage bags—is a result of the allegedly unreasonably dangerous defect." *Southwest Pet II*, 32 Fed.Appx. at 216. Benson also argued that vomitoxin in wheat is not unreasonably dangerous because the side effects that it causes are not catastrophic or long-term. *Id.* at 6–7. Citing *Scheller*, Benson argued that "[i]f pork infested with trichinosis and consumed by the public, causing the Plaintiff's death[,] is not considered defective and unreasonably dangerous for strict liability purposes, it is doubtful wheat that may cause

### 3. Is Wheat Containing Vomitoxin Unreasonably Dangerous Due to an Informational Defect?

■ As noted above, Southwest also claimed that the wheat was unreasonably dangerous due to an informational defect. Southwest argues that the wheat was defective and unreasonably dangerous because Benson failed to warn Southwest of the presence of vomitoxin at a level that is unsafe for consumption by pets. Pl.'s Notice of Mot. at 9.[28]

■ In order for Southwest to make out a prima facie case of strict products liability based on an informational defect, it had to establish that (1) Benson had a duty to warn Southwest of the potential for vomitoxin in the wheat; (2) the missing warning made the product defective and unreasonably dangerous; (3) the warnings were missing when the wheat left Benson's hands; and (4) Benson's failure to warn Southwest caused Southwest's injuries. *Gosewisch v. American Honda Motor Co., Inc.*, 153 Ariz. 400, 403, 737 P.2d 376 (1987) (superseded on other grounds by Ariz.Rev. Stat. § 12–2505). The Court focuses its discussion around the first and fourth prongs: duty and causation. It is in these two areas that Southwest fails to go beyond the pleadings and demonstrate that there is a material issue for trial.

■ Southwest argues that Benson knew that its wheat might contain vomitoxin and that it was shipping to a pet food manufacturer and did not warn Southwest, thus breaching its duty to warn. Pl.'s Notice of Mot. at 10–11. Even assuming that Benson had this knowledge and failed to warn Southwest, the inquiry of whether Benson had a duty to do so centers on whether the danger was generally known among the relevant consumer group. Although a product may have an informational defect even if it is "faultlessly made," *Wilson v. U.S. Elevator Corp.*, 193 Ariz. 251, 254, 972 P.2d 235 (Ariz.Ct.App. 1998), the ability of a plaintiff to prevail under the informational defect doctrine is limited when the condition causing the injury is open, obvious, and known to the plaintiff. This follows because the primary concern that strict products liability is meant to address is the "surprise element of danger." *Maas*, 10 Ariz.App. at 522, 460 P.2d 191; *Golonka*, 65 P.3d at 969 ("The specter of a strict liability information defect judgment provides a strong incentive for manufacturers to adequately warn consumers about *hidden* dangers linked with product use.") (emphasis added). As the *Maas* court explained, "if the plaintiff is Aware of such condition, there can be no surprise element of danger." *Maas*, 10 Ariz.App. at 522, 460 P.2d 191 (capitalization in original).[29] Likewise, the Arizona Supreme Court in *Scheller* noted that "failure to warn is not considered a defect where the danger is generally known and recognized." *Scheller*, 114 Ariz. at 166, 559 P.2d 1074. Similarly, the

---

temporary vomiting in dogs would be considered defective and unreasonably dangerous." *Id.* at 7. For this purpose, *Scheller* is inapposite. The *Scheller* ruling was not based on an assessment of whether death is a sufficiently dangerous side effect, but rather—as discussed above—an assessment of whether the presence of the defect (trichinosis) was within consumer expectations.

**28.** Benson argues that this alternative theory should not be considered because Southwest pled only that the wheat was "contaminated,"

and was therefore only making a manufacturing defect claim. Def.'s Mem. in Opp'n at 5. Under the theory of notice pleading, however, Southwest's complaint ought not be so narrowly construed as to rule out a theory of unreasonable dangerousness based on an informational defect. *See* Compl. ¶¶ 148–154. The Court rejects this argument.

**29.** Although *Maas* involved a condition that was not only known by the plaintiff but was also open and obvious, the court stressed the importance of awareness.

Restatement (Second) of Torts stresses the importance of knowledge on the part of the relevant consumer group. *See* Restatement (Second) of Torts § 402A, cmt. j (1965) ("But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized.").

■ Here, as explained above, the potential that sample grade wheat bought from the 1993–94 midwestern crop would contain vomitoxin was generally known, recognized, and expected by the relevant consumer group—pet food manufacturers. Presumably, Southwest tested for vomitoxin precisely because it had knowledge or an expectation that Benson's wheat might well contain vomitoxin at levels that would render it unsuitable for pet food.[30] Just as the plaintiffs in *Scheller* knew that pork must be cooked before it can be safely eaten, Southwest (along with other pet food manufacturers) knew that raw wheat bought from the midwest during this time period had to be tested for vomitoxin and then blended or cleaned before it could safely be used to make pet food.[31] Given this awareness, Benson had no duty to warn Southwest of the potential for vomitoxin in the wheat.

■ The other problem raised by Southwest's informational defect claim is that of causation. Even had there been a duty to warn here, and had Benson warned Southwest about the risk of vomitoxin, Southwest has produced absolutely no evidence that it would have taken any additional precautions beyond testing the wheat. *Dole Food Co.*, 188 Ariz. at 305, 935 P.2d 876 ("What is required is evidence that had a proper warning been given, [the plaintiff] would not have used the product in the manner which resulted in his injury, or by evidence that certain precautions would have been taken that would have avoided the accident.") (internal quotation marks omitted). Just as the plaintiffs in *Scheller* relied on the local meat processor-retailer to take the precau-

---

**30.** Benson also claims that it did not have a duty to warn Southwest because Koch had the requisite knowledge. Def.'s Mem. in Opp'n at 7. Its reliance on *Dole Food. Co. v. N.C. Foam Indus., Inc.*, 188 Ariz. 298, 303, 935 P.2d 876 (Ariz.Ct.App.1996) for this proposition is misplaced. While the court in *Dole* ruled that a seller can satisfy its duty to warn by warning a sophisticated intermediary, it noted that this is not always sufficient. *Id.* at 302–303, 935 P.2d 876; Restatement (Second) of Torts § 388 cmt. n (1965); *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 433, 581 P.2d 271 (Ariz.Ct.App.1978) (noting that a bulk seller or manufacturer is not necessarily relieved of its duty to warn simply because it warned the intermediary seller). Furthermore, Benson has introduced no evidence that it warned Koch of the risk of vomitoxin in the wheat.

**31.** The Court notes, as did the *Maas* court, that this analysis is different from that giving rise to assumption of the risk. *Maas*, 10 Ariz.App. at 522–23, 460 P.2d 191. Assumption of the risk involves analysis of the actual, subjective appreciation of the danger by the plaintiff, *id.*, and requires that the plaintiff have possessed "actual knowledge of the specific risk which injured him," appreciation of its magnitude, and then have voluntarily chosen "to accept the risk given the circumstances." *Gonzales v. Arizona Pub. Serv. Co.*, 161 Ariz. 84, 89, 775 P.2d 1148 (Ariz.App.Ct. 1989). Whether Southwest assumed the risk is, under Arizona law, an issue that must be submitted to a jury (if the requisite evidence for an instruction on the defense is adduced). *Maas*, 10 Ariz.App. at 522, 460 P.2d 191; Ariz.Rev.Stat. Const. Art. 18, § 5.

On February 2, 2003, this Court ruled in error that Benson could not present evidence on an assumption of the risk defense. This error was corrected during a subsequent pretrial conference. Thus, were this case to go to trial, evidence on assumption of the risk could be presented upon an appropriate foundation.

tionary step of cooking the pork, here Southwest relied on Wasatch to take the precautionary steps of testing the vomitoxin. By doing so, the plaintiffs in *Scheller*—like Southwest—believed that [they] had adequately avoided the danger. *Scheller*, 114 Ariz. at 165, 559 P.2d 1074. Thus, as Benson argues, even had Benson given a warning, "the result would be no different since Southwest had the wheat tested" even without the warning. Def.'s Mem. in Opp'n at 9. As in *Scheller*, any warning "would have been a superfluity." *Scheller*, 114 Ariz. at 165, 559 P.2d 1074.

Although ordinarily the issue of proximate cause is a question of fact, summary judgment may be appropriate absent proper evidentiary foundation. *Gosewisch*, 153 Ariz. at 403–04, 737 P.2d 376 (1987) (affirming trial court's refusal to issue an instruction on warning because plaintiffs did not present any evidence that a different warning would have changed the plaintiff's conduct); *Gebhardt v. Mentor Corporation*, 191 F.R.D. 180, 185 (D.Ariz.1999) (holding that summary judgment for defendants was proper when plaintiff did not present any acceptable testimony that the plaintiff would have acted differently if

different warnings had been given); *cf. Golonka*, 65 P.3d at 966 (holding that plaintiff met burden of presenting evidence of a causal link between lack of warning and injury). Here, Southwest has presented absolutely no evidence that a different warning would have changed its conduct. There is simply no evidence that Southwest would have done anything more than it actually did—test the wheat.[32] Therefore, Southwest has failed to demonstrate that any failure to warn was a proximate cause of Southwest's injury.

In sum, no reasonable jury could find that the raw wheat Benson provided to Southwest was unreasonably dangerous due to an informational defect or that failure to warn was a proximate cause of Southwest's injury.

## IV. CONCLUSION

For the foregoing reasons, Benson's motion for summary judgment [Docket No. 485] of Southwest's claim for strict products liability was ALLOWED on April 16, 2003.[33]

---

**32.** Arizona applies a rebuttable presumption that a warning would be read and heeded if given. *Golonka*, 65 P.3d at 967. Although this presumption shifts the burden of production to the manufacturer to introduce evidence that the injured party would not have heeded an adequate warning, *id.* at 971, here Southwest did what any warning would prompt it to do—it had the wheat tested for vomitoxin. Both Benson and Southwest have produced evidence that buyers need to determine the vomitoxin level to ensure that the end-product will come within the guideline range. As noted above, buyers can do this either by contracting (before they receive the wheat) for a vomitoxin limit or by testing the wheat before it is used. Through either method, the buyer learns how much vomitoxin is in the wheat and whether it needs to be cleaned or blended before using it for whatever purpose it desires.

**33.** As noted earlier, Benson sought summary judgment on other grounds as well. The Court need not address these other grounds because it has granted summary judgment in favor of Benson based on the grounds discussed herein. For the completeness of the record, however, the Court rules that it rejects, as without merit, Benson's arguments that summary judgment should be granted based on the statute of limitations and/or the *Salt River* Test. Additionally, the Court rejects Benson's argument that Southwest's claims should be dismissed under the doctrines of res judicata, collateral estoppel, or judicial estoppel for the same reasons that this Court previously rejected this argument—a ruling upheld by the Ninth Circuit. *See Southwest Pet I*, 89 F.Supp.2d at 1127–1128; *Southwest Pet II*, 32 Fed.Appx. at 215. Additionally, the Court rules that recovery by Southwest against Benson is not precluded simply be-

cause Southwest settled with Koch, a downstream seller. If this case went to trial, however, Southwest's recovery would be limited by Arizona Law:

> If a release or covenant not to sue ... is given in good faith to one of two or more persons liable in tort for the same injury ... it does not discharge any of the other tortfeasors from liability ... but it reduces the claim against the others to the extent of any amount stipulated by the release of covenant or in the amount of consideration paid for it, whichever is the greater.

Ariz.Rev.Stat. § 12–2504. Thus, Southwest's damage claim against Benson would have to be decreased by the total amount it received from Koch.

Because the Court has granted summary judgment in Benson's favor, there is no need to address separately its reasons for its denial of Southwest's motion for summary judgment.